# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Prosecution,** | ) | |
| | ) | |
| **v.** | ) | **DOCKET NO. 1:16-CR-0212-003** |
| | ) | |
| | ) | **HON. CHRISTOPHER CONNER** |
| **TOREY WHITE,** | ) | |
| **KEVIN COLES,** | ) | **ELECTRONICALLY FILED** |
| **Accused.** | ) | |

## BRIEF IN SUPPORT OF MOTION TO ADMIT
## PRE-TRIAL STATEMENTS OF KENYATTA CORBETT
## AND, IF NECESSARY, TO SEVER DEFENDANTS

COMES NOW the Accused, Torey White, by counsel, pursuant to Federal Rules of Evidence ("FRE") 804(b)(3) and 807, *Brady v. Maryland*, 373 U.S. 83 (1963), *Chambers v. Mississippi*, 410 U.S. 284 (1973), Federal Rule of Criminal Procedure 14, the Fifth and Sixth Amendments to the United States Constitution, and other authorities cited herein, and submit the following brief in support of his Motion to Admit Pre-Trial Statements of Co-defendant Kenyatta Corbett and, if Necessary, to Sever Defendants.

**Codefendant Kevin Coles joins in this Motion.**

In this case, the Government has stated its intention to call Co-defendant Michael Buck at trial.  Based upon review of discovery materials, Buck is the only witness who will assert direct knowledge that Torey White participated in the

planning of the robbery/homicides in Mercersburg on June 25, 2016. Buck's accusations against Mr. White are implausible on their face. During his proffer, Buck claimed that Torey White attended a meeting at his house on the evening of June 25, 2016, during which a group that included Buck and Co-defendants Christopher Johnson, Jerrell Adgebesan, Johnnie Jenkins Armstrong, Kenyatta Corbett, and possibly others from Baltimore planned the offense. Of all of the defendant/witnesses who have admitted attending this meeting, *only* Buck has stated that Torey White—or anyone who could have been Torey White—was present. During his proffer, Buck further claimed that the purpose of the group going to the Jackson's residence was to carry out a hit of a woman who was suspected of cooperating with law enforcement, Wendy Chaney, and that Torey White's role was to make sure that Ms. Chaney was at Jackson's residence when the others arrived.

In addition to being unsupported by the statements of any other co-conspirator, Buck's accusation is contradicted by other evidence. Torey White has given notice of an alibi during the time of the meeting and will present proof thereof at trial. Moreover, the many hundreds of gigabytes of phone data that the Government has provided in discovery in this case *do not reveal a single communication between Torey White and any of his alleged co-conspirators*, ever. It is extraordinarily unlikely that Torey White attended a meeting at Michael

Buck's house on June 25, 2016, to plan a robbery/homicide with a group of men that he had never once in his life communicated with. But that will be Buck's testimony.

Buck's accusation is also suspect due to its lack of timeliness. Despite receiving information on the first day of this investigation that Buck had made a suspicious trip to the scene of the crime with a black male on the morning of the murders, investigators never interviewed Buck for more than seven weeks after the offense. When investigators finally did interview Buck on August 15, 2016, he lied to them. Buck claimed that he had gone to Phillip Jackson's house that morning with a white male, when in fact investigators had been told by eyewitnesses that he had been accompanied by a black male. In his August 16, 2016 interview, Buck maintained that he knew nothing about these homicides and, when asked directly, stated that he did not know Torey White.

It was more than three years later, during proffer sessions in January of 2020, that Buck first accused Torey White of having any involvement in the planning of these crimes. The notes from Buck's proffer reveal a strong emotional reaction when he first began to inculpate Torey White:

3

> BUCK stated that when they arrived in Hagerstown, Tory WHITE aka DROP sitting on the front stoop of Tyler CHANEY's grandmother's residence (Wendy CHANEY's mother) and had been driving Philip Jackson's Toyota truck. BUCK stated that he and WHITE had a conversation about whose truck WHITE was driving. BUCK was visibly shaken up while admitting to this information. BUCK was allowed to converse with his attorneys of several occasions. BUCK stated that he was extremely afraid of Torey WHITE. BUCK stated that WHITE was in a heated argument with someone inside the residence. BUCK stated that WHITE had gold teeth and was a very large, black male. BUCK stated that CORBETT dropped BUCK off but did not speak with WHITE at that time saying something to the effect of "that bitch needs to go." BUCK did recall speaking with CORBETT and stating that "Drop" was driving Phil's truck that morning. BUCK stated that he is unsure how or if CORBETT directly knows "Drop".

USASupp-12524. Later in the interview, Buck became emotional again when talking about Torey White:

> BUCK was shown a picture of Torey WHITE then a Facebook video of Torey WHITE speaking. BUCK, who was emotional at this point, broke down and stated that WHITE was in his kitchen with the group and he was the one whose job it was to "get Wendy to the property." BUCK stated that WHITE was not with the group in the van when they arrived, but walked on foot from the rear alley of the property as soon as the group was getting out of the van. BUCK admitted that while in the kitchen, the group listened to him and CORBETT describe the layout of the property and that the "informant" was supposed to be there at which time WHITE said something to the effect that the "the bitch is going to be there." BUCK stated that WHITE had gold teeth. BUCK stated that he (BUCK)

USASupp-12525. So twice when discussing Torey White's alleged involvement in the planning of these crimes Buck was overcome with emotion. The first time Torey White's name came up he was "visibly shaken up" and needed to pause the proffer to meet with his counsel. The second time Torey White's name came up he "broke down." The Government will undoubtedly claim that Buck became emotional because he was particularly frightened of Torey White (as opposed to the actual group of gang members and admitted killers who assembled in his kitchen). And that may be one interpretation of his emotional reaction to inculpating Torey White. Another interpretation—and one consistent with the evidence that will show that that Torey White could not have attended the meeting in Buck's house—is that Buck became emotional when discussing Torey White (and only when discussing Torey White) because he was lying about Torey White.

4

This brings us to Kenyatta Corbett.  Corbett was one of the last of the alleged co-conspirators to be identified and charged in this case, likely because his nickname "K" was also the nickname of Kevin Coles, so that whenever witnesses discussed "K," the investigators assumed they were talking about Coles when in fact they were describing Corbett.  *See* USASupp-014801 (Grand Jury testimony of Keith Kierzkowski) ("We had already identified one of the individuals in this case as another K by the name of Kevin Coles. . . So we were already concentrating on this particular K, but in this case there happened to be two Ks.").

Corbett was arrested on July 20, 2018, Mirandized, and interviewed that same day.  Corbett gave a lengthy statement in which he provided a detailed account of this offense that differs radically from Buck's proffer.  In the initial portions of his interview, Corbett discussed riding to the Jackson property in the morning on June 25, 2016, with a white junkie to whom he had been selling heroin.  Although Corbett did not use the name "Michael Buck," the person he described matched the description of Buck and lived on Elizabeth Street in Hagerstown.  After initially denying being having been present when the homicides were committed, Corbett asked to use the bathroom.  When he returned, Corbett continued to speak with investigators and gave the following information: Corbett stated that he and a woman named Angela Barney drove to the Jackson residence in a caravan with a group of people who had met at Buck's house.  When

asked why he went with the others, Corbett answered "because I was the only one available who knew that route."[1]  Corbett stated that he and Angela Barney sat in the car and waited on the road while the others went onto Jackson's property. Corbett stated that he and Barney sat there until he heard gunshots, at which time Corbett told Barney that it was time to leave.

Corbett stated that the first time he and Buck went to the Jackson property that morning, Buck had told him that there was going to be money and drugs at Jackson's residence.  Corbett emphatically and repeatedly stated that the purpose of going to Jackson's residence that evening was to conduct a robbery, not to carry out any "hit."  He stated that he was unaware that any person at the residence that night was suspected of being a government informant.  Corbett stated that although he did not realize it at the time, he now believes that the reason Buck took him to the Jackson property that morning was to do surveillance for the robbery.

Corbett stated that later that after his trip to the Jackson residence on the morning of June 25, 2016, he traveled to Baltimore, where he met up with "Rell." Corbett stated that he informed Rell that Buck had told him that there were valuables at the Jackson residence that could be stolen.  Corbett said that Rell

---

[1] Torey White, who was at the Jackson residence many times per day and rented a house from Phillip and Amber Jackson, certainly knew the route to Jackson's residence better than anyone in the caravan.  If Mr. White was involved in the conspiracy to commit this offense, he would have been the obvious choice to escort the perpetrators to the area of Jackson's house.

responded that he knew people who could get the job done, and that Rell talked to those people.  Corbett stated that the group traveled from Baltimore to Hagerstown where they met up at Buck's house.  Corbett estimated that they were at Buck's residence for 15–25 minutes.  Corbett stated that Buck told the group from Baltimore that Jackson had a lot of money and a "pile of drugs" and that Jackson kept it in the barn and in the house.

Corbett stated that after the meeting, he met up with Angela Barney at the nearby residence of Lakeisha Gibson.  After Barney picked Corbett up, he and the group from Baltimore drove the Jackson property in three vehicles.  Once there, he and Barney waited in the car on the road while the others went onto the property to conduct the robbery.  When Corbett heard the gunshots he told Barney "I don't know what the fuck they doing up there, it's time to go," and they left and drove to West Virginia.  Corbett stated that he didn't know if it was the victims or the robbers who had been shot.

When the investigators told Corbett that they did not believe it would make sense for the group to travel all the way to Mercersburg from Baltimore for a robbery, but that coming there to kill a snitch made more sense, Corbett answered "That definitely wasn't the case, at all."  Corbett repeatedly insisted that the reason for going to the Jackson residence was to commit a robbery, not a hit.  Corbett continued: "Those killings, like, that wasn't planned."  He added, "if that had been

the case I would have never left when I heard the gunfire shots. . . . I would never have left them there once I heard the gunshots. . .  If the plan was for them to go in and assassinate everybody, or assassinate people, like I would have never been disturbed by the gunshots."

Corbett confirmed this account in at least two subsequent statements.  First, on November 25, 2019, the DEA requested and conducted a polygraph examination of Corbett.  During the pre-polygraph interview, Corbett told exactly the same story that he had told on July 20, 2018.  He described traveling to the farm with Michael Buck on the morning of June 25, 2016, and discussing a robbery.  He described meeting with Rell in Baltimore later that day, and Rell in turn recruiting a group of three black males in Baltimore.  He described traveling from Baltimore to Hagerstown in a blue Saturn with Rell while the three black males followed in a van.  With respect to the meeting at Buck's house, Corbett specifically stated that "he, the three black males, and Adgebesan entered Buck's residence.  Corbett stated that the three black males, Adgebesan, and Buck talked in the kitchen."  USASupp-015192.  Corbett did not mention any other person attending that meeting.  Corbett then described meeting up with Angela Barney and riding to the Jackson residence in her car, accompanied by the blue Saturn and van.  Corbett stated that he and Barney waited in the car while Rell and the three black males entered the property.  "Corbett stated that after 10 to 15 minutes, he

heard multiple gun shots and that he and Barney immediately left the area and went to West Virginia."  USASupp-015193.

Corbett was asked three relevant questions during the polygraph examination.  He was asked:

> Did you plan with anyone to shoot them?  Answer – No.
>
> Were you involved in the planning of shooting them?  Answer – No.
>
> Did you know that anyone was going to shoot them?  Answer – No.

*Id*.  The report indicated that "[t]he examinee was No Deception Indicated (NDI) on the planning questions.  The examinee was inconclusive on the knowledge question.  The overall result is Inconclusive."  *Id*.[2]

Third, Corbett proffered with the Government on March 2, 2020.  The Government has not produced any report of this proffer, but on December 14, 2021—five days after the Court's Jencks and *Giglio* deadline, almost a year after the Court ordered the "immediate" production of any *Brady* evidence, and following four prior requests for Corbett's proffers by Mr. White—the Government finally produced fourteen pages of handwritten notes taken during Corbett's March 2, 2020 proffer.  It is unclear who took these notes.  Only one set

---

[2] Mr. White does not suggest that the results of Corbett's polygraph examination would be admissible at trial.  The fact that Corbett gave a second detailed account of this offense that was consistent with his July 20, 2018 statement is admissible.

of notes appears to have been provided although the defense believes that at least two investigators attended the proffer.[3]  While the notes are not easy to decipher, counsel's review suggests that Corbett gave substantially the same account that he had given in his first two statements.

It should be noted that The Government has provided two proffer agreements signed by Corbett and the United States.  The first proffer agreement was dated December 17, 2019, weeks after Corbett's polygraph, and was signed by Corbett and his counsel on December 19, 2019.  USASupp-13512.  The second was dated February 5, 2020, and signed by Corbett and his counsel on February 24, 2020.  USASupp-13508.  Despite Mr. White's repeated requests for Corbett's proffers under *Brady v. Maryland*, 383 U.S. 72 (1963), no notes or reports have ever been provided for any December 2019 proffer.

On December 21, 2021, counsel for Torey White served a trial subpoena upon Corbett through his attorney, Edward Ungvarsky.  On December 22, 2021, counsel for Corbett filed a Notice of Intention to Assert Fifth Amendment Privilege if Called to Testify at Trial in this Matter.  Doc. 1079.  If the Court determines that Corbett has a valid Fifth Amendment privilege to decline to testify

---

[3] Counsel for Mr. White believe that the notes were taken by DEA Agent Keirzkowski.  The notes indicated that the proffer was attended by "Defense x2, Behe, Decker."  USASupp-016681.  If counsel's interpretation of the notes is correct, PSP Trooper Paul Decker would also have taken notes during the proffer, and they have not been produced.

10

in this matter, then Corbett will be an unavailable witness within the meaning of the Federal Rules of Evidence.  F.R.E. 804(a) ("A declarant is considered to be unavailable as a witness if the declarant is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies").  Thus, Corbett's prior statements are admissible to the extent that they meet one of the hearsay exceptions set forth in Federal Rules of Evidence 804 and 807.[4]

F.R.E. 804(b)(3) recognizes the "statement against interest" exception to the general rule excluding hearsay.  The exception allows the introduction of an unavailable witness's hearsay statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability."  F.R.E. 804(b)(3)(A).  Corbett's statements to law enforcement are admissible under this exception.  Several courts, including circuit courts and a sister federal district court in Pennsylvania have noted that "trial judges should apply a liberal standard in determining whether a statement tended to subject a declarant to criminal liability."  *United States v. Ditizio*, 530 F. Supp.

---

[4] They may also be admissible even if they do not qualify as hearsay exceptions. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that the constitution's fair trial requirement is violated where the trial court excludes trustworthy evidence that was critical to the defendant's defense through a "mechanistic" application of the hearsay rule) (discussed further *infra*).

175, 178 (E.D.P.A. 1982); *United States v. Satterfield*, 572 F.2d 687, 691 (9th Cir. 1978); *United States v. Thomas*, 571 F.2d 285, 288 (5th Cir. 1978).

The *Ditzio* decision is particularly instructive. In *Ditizio*, the defendant was scheduled to be tried along with his alleged co-conspirator, Fardella. Ditizio sought severance from Fardella, arguing that "Fardella made statements in an off-the-record interview with Government agents which if introduced at trial would tend to exculpate [Ditizio]" and "since these statements could not be introduced at a joint trial, severance is necessary to allow Ditizio to present a fair and complete defense." *Ditizio*, 530 F. Supp. at 176. The court noted that "[t]he gist of Fardella's allegedly exculpatory statement was that he and Charles Allen, an unindicted co-conspirator, were the only members of the conspiracy." *Id*. at 177. The statement was made during a proffer with the United States Attorneys prosecuting the case. *Id*. Ultimately that court determined that Ditizio was likely entitled to introduce Fardella's proffer statements in his defense, and that severance was necessary in order to enable him to do so. *Id*. at 178 (finding likelihood that the statement qualified for the 804(b)(3) hearsay exception); *id*. at 179 (granting severance).

In this case, Corbett admitted to law enforcement that he joined a conspiracy to commit an armed robbery that resulted in a triple homicide. There can really be no doubt that these statements "tended to subject" Corbett to criminal liability.

Corbett's out-of-court statements in this case are remarkably similar to Fardella's out-of-court statement that was held to be admissible in *Ditzio*.  Like Fardella, Corbett has included himself in a criminal conspiracy and has identified the other members of that conspiracy not to include Torey White.[5]

FRE 804(b)(3)(B) further requires that in addition to tending to subject the declarant to liability, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."[6]  The *Ditizio* court found that this requirement was satisfied by the terms of Fardella's proffer agreement, which were "plainly designed to guarantee the veracity of Fardella's utterances."  *Id*. at 178.  Specifically,  the court noted that Fardella's proffer

---

[5] The *Ditizio* court specifically rejected the government's argument that statements made pursuant to a proffer agreement did not tend to subject the declarant to criminal liability because the agreement precluded the government from using the statements against him in its case-in-chief.  *Ditizio*, 520 F. Supp. at 177–78.  The court noted that Fardella's proffer statements still tended to subject him to criminal liability because the proffer agreement permitted the government to make derivative use of his statements.  *Id*. at 178.  The same is true of Corbett's proffer agreements in this case; both contained derivative use provisions.  USASupp-013506 (Feb. 5, 2020, proffer agreement); USASupp-013510 (Dec. 17, 2019, proffer agreement).

[6] It is not clear that this provision applies to Mr. White.  Mr. White is not offering the statement to prove Mr. Corbett's guilt or the guilt of a codefendant, he is offering it to exculpate himself.  Nevertheless, assuming that Mr. White has the burden of showing corroborating circumstances that clearly indicate the trustworthiness of Corbett's statements, he easily satisfies this burden for the reasons stated herein.

agreement permitted the government to use Fardella's statements to cross-examine him if he gave testimony that conflicted with his proffer, a provision "necessary to ensure that (he) does not abuse the opportunity for an 'off-the-record' proffer or discussion, does not make materially false statements to a government agency, and does not commit perjury when testifying at trial." *Id*. The court also noted that Fardella's proffer agreement also included Fardella's agreement to take a government conducted polygraph. *Id*. Corbett's proffer agreements contain identical provisions, and are similarly "designed to guarantee the veracity" of Corbett's statements. USASupp-013506 (Feb. 5, 2020, proffer agreement); USASupp-013510 (Dec. 17, 2019, proffer agreement). For this reason, Corbett's out-of-court statements also satisfy FRE 804(b)(3)(B)'s trustworthiness requirement.

The Third Circuit has identified additional factors that the Court should consider in assessing the trustworthiness of the out-of-court statement. *United States v. Caldwell*, 760 F.3d 267, 289 (3rd Cir. 2014). Each of these factors support the admissibility of Corbett's statements in Mr. White's defense. In *Caldwell*, the Third Circuit noted that the requirement of corroborating circumstances "reflects the concern that a third party with less risk of prosecution will fabricate a confession to exculpate the guilty party." *Id*. (citing *United States v. Guillette*, 547 F.2d 743, 754 (2nd Cir. 1976)). The Third Circuit further noted

14

that the "rule does not require that *the information within the statement* be clearly corroborated; it requires only that there be corroborating circumstances that clearly indicate the trustworthiness of *the statement itself*." *Id.* (emphases in original). The *Caldwell* Court identified three such circumstances. First, the Court considered the lack of relationship between the declarant and accused. *Id.* (citing *United States v. Silverstein*, 732 F.2d 1338, 1346 (7th Cir. 1984)). In this case, there is no evidence that Torey White and Kenyatta Corbett had ever met or communicated; there is clearly no reason that Corbett would have fabricated a statement to assist a complete stranger. Second, the *Caldwell* Court considered whether the declarant's statement was voluntarily made after the declarant was advised of his *Miranda* rights. *Id.* (citing *United States v. Price*, 134 F.3d 340, 347–48 (6th Cir. 1998)). This is true of all of Corbett's statements in the present case. Third, the *Caldwell* Court considered whether the statement was made to curry favor with law enforcement. *Id.* (*United States v. Garcia*, 897 F.2d 1413, 1421 (7th Cir. 1990)). In this case, Corbett was never given any assurances that his statement would result in a favorable outcome. In fact, during his post-arrest interview, Corbett stated "it looks like I'm going to be in jail for the rest of my fuckin' life for real, that's what it looks like." Moreover, Corbett's statements have not curried favor with law enforcement. He is not a cooperator in this case

specifically because he repeatedly refused to endorse the prosecution's theory that this was a "hit" on Wendy Chaney.

In addition to the three *Caldwell* factors, Mr. White suggests that the Court should consider the consistency of Corbett's statements as an additional factor proving the trustworthiness of his statements.  At least three times, Corbett has offered lengthy and detailed accounts of this offense that differed very little, if at all.  The same cannot be said of any of the Government's cooperators in this case, all of whom have changed their stories dramatically from their initial interviews.

Finally, although it is not necessary that Corbett's statements themselves be corroborated, it is worth noting that they will be partially corroborated by another witness, Angela Barney, who has informed investigators that she and Corbett rode to the Jackson residence together and waited outside in her car.  Barney did not hear the gunshots herself, but confirms that the purpose of going to the property was to conduct a robbery, and that she and Corbett left together.  Corbett's statements will also be corroborated by other evidence in this case, including phone records and an alibi witness that show that Torey White could not have attended the meeting that Buck claims, consistent with Corbett's statements.

In sum, Corbett is an unavailable witness, his statements tended to expose him to criminal liability, and his statements are corroborated by a wealth of evidence that indicate their trustworthiness.  Based upon these factors, Torey

White asks the Court to rule that Corbett's pre-trial statements are admissible in his defense.

At least two additional bases exist for the admission of Corbett's statements. First, FRE 807 creates a "residual hearsay exception."  Under this rule, an out-of-court statement may be offered to prove the truth of the matter asserted if the statement is (1) supported by sufficient guarantees of trustworthiness, and (2) more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.  F.R.E. 807.  <u>Pursuant to FRE 807(b), Mr. White and Mr. Coles hereby give written notice of their intention to offer Corbett's statements under this Rule</u>.  The same factors that show the trustworthiness of Corbett's statements under FRE 804(b)(3) also show its trustworthiness under FRE 807.  *See supra* at 13–16.[7]  And clearly, Corbett's detailed account of this offense is more probative that any other evidence that Mr. White can obtain of the fact that the purpose of going to the Jackson residence on June 25, 2016, was to conduct a robbery, not to assassinate anyone.  In this case, Corbett (through "Rell") is the only link between Hagerstown and the perpetrators from Baltimore who actually entered Jackson's property and killed the victims.  If

---

[7] The *Ditizio* court was persuaded that, in addition to the "statement against interest" exception, the declarant's statements were admissible under the residual hearsay exception, which was then codified at FRE 804(b)(5).  *Ditizio*, 530 F. Supp. at 179.

Corbett was unaware of any plan to murder a witness (which he emphatically insisted, continued to insist, and was found not deceptive on his polygraph in asserting), then there is no possibility that the group traveled from Baltimore to Hagerstown for the purpose of murdering Wendy Chaney.  This leaves Torey White with *no role in this conspiracy whatsoever.*  And Corbett's account of the meeting at Buck's house, which included only Buck, Corbett, Rell, and the group that traveled from Baltimore in the van, obliterates the Government's claims that Torey White attended that meeting.

Lastly, the United States Supreme Court has ruled that, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers v. Mississippi*, 410 U.S. 384, 302 (1973).  The *Chambers* Court reversed a conviction where the defendant was prevented from calling witnesses to testify that another man had confessed to the shooting for which the defendant was on trial.  The Court concluded that "the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." *Id*.  Because the evidence offered by Torey White bears persuasive assurances of trustworthiness, is within "the basic rationale of the exception for declarations against interest," and is critical to Mr. White's defense, a trial in which he is not

permitted to introduce this evidence will be fundamentally unfair under *Chambers*. *Id*.

## **Motion to Sever**

Mr. White anticipates that at least one remaining codefendant, Jerrell Adgebesan, is likely to oppose the admission of Corbett's pre-trial statements. To the extent that Mr. Adgebesan is inculpated by Corbett's statements, Mr. White anticipates that Mr. Adgebesan would argue that his right to confront the evidence against him would be violated by admitting Corbett's out-of-court statements.

In 1993, the Supreme Court declined to adopt a bright-line rule requiring severance whenever codefendants presented "mutually antagonistic defenses." *Zafiro v. United States*, 506 U.S. 534, 538 (1993). In doing so, however, the Court noted that severance is required "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539. The Court continued: "Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id*. The Court also noted that "a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." *Id*. These examples illustrate precisely the dilemma here. There is no doubt that the

Government could not introduce Corbett's out-of-court statements against Mr. Adgebesan at trial.  Proffers and *Mirandized* post-arrest interrogations are obviously testimonial, and Mr. Adgebesan's right to confront the evidence against him would be violated if the Government attempted to prove his guilt through the use of these statements.  *Crawford v. Washington*, 541 U.S. 36 (2004).  Here, Mr. White's and Mr. Coles's constitutional right to present a complete defense is squarely at odds with Mr. Adgebesan's constitutional right to confront the evidence against him; these rights cannot be reconciled.

Under these circumstances, the remedy is severance of defendants.  *See Ditizio*, 530 F. Supp. at 179 (granting severance) (holding that "the risk of unduly constricting Ditizio's defense by preventing him from introducing important exculpatory testimony in a joint trial is sufficiently clear that, in my judgment, considerations of judicial economy are outweighed"); *Tifford v. Wainwright*, 588 F.2d 954, 957 (5th Cir. 1979).

## **CONCLUSION**

WHEREFORE, Torey White respectfully moves this Honorable Court to allow the admission of Kenyatta Corbett's pre-trial statements in Mr. White's and Mr. Coles's defense at trial and, if a remaining codefendant objects to this ruling, to sever the defendants for separate trials.

Respectfully submitted,

Counsel for Torey White

/s/ Matthew L. Engle, Esquire
Matthew L. Engle, Esquire
Va. Bar No. 46833
DONOVAN & ENGLE, PLLC
1134 East High St., Unit A
Charlottesville, Virginia 22902
(800) 428-5214 (telephone)
(434) 465-6866 (fax)
matthew@donovanengle.com

/s/ Donald F. Martino, Esquire
Donald F. Martino, Esquire
PA ID # 85476
25 West Third Street, Suite 102
Williamsport, Pennsylvania 17701
(570) 567-7055 (telephone)
(570) 505-1601 (fax)
dmartino0022@comcast.net

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Prosecution, | ) | |
| | ) | |
| v. | ) | DOCKET NO. 1:16-CR-0212-003 |
| | ) | |
| | ) | HON. CHRISTOPHER CONNER |
| TOREY WHITE, | ) | |
| KEVIN COLES, | ) | ELECTRONICALLY FILED |
| Accused. | ) | |

## CERTIFICATE OF SERVICE

AND NOW comes Matthew L. Engle, Esquire, counsel for Torey White, and certifies that a true and correct copy of the foregoing Brief has been served upon AUSA Willam A. Behe, Federal Building, 228 Walnut Street, P.O. Box 11754, Harrisburg, Pennsylvania 17108 via E.C.F., or, if necessary, by first class mail, postage prepaid, this 27th day of December, 2021.

/s/ Matthew L. Engle, Esquire
Matthew L. Engle, Esquire
Va. Bar No. 46833
DONOVAN & ENGLE, PLLC
1134 East High St., Unit A
Charlottesville, Virginia 22902
(800) 428-5214 (telephone)
(434) 465-6866 (fax)
matthew@donovanengle.com