**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:16-CR-212 |
|---|---|---|
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| TOREY WHITE, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

The defendant asks the undersigned judicial officer to recuse from this criminal action because, after the defendant's plea agreement was finalized and filed to the docket, the court pointed out a legal defect in the agreement and gave counsel the opportunity to negotiate a revised agreement if they chose to do so. We will deny the defendant's motion.

## I.   Background

The criminal investigation and charges in this case originate with a triple homicide and robbery on June 25, 2016. The third superseding indictment identifies the homicide victims as Wendy Chaney, Phillip Jackson, and Brandon Cole. Chaney was the target of the murders; several of the codefendants in this case learned she was cooperating with law enforcement regarding their drug-trafficking activities and decided to have her killed. The murders and robbery occurred in a barn on Jackson's farm, located at 11026 Welsh Run Road in Mercersburg, Franklin County, Pennsylvania.[1] Charging documents allege, and a codefendant has since

---

[1] The alleged events leading up to, and on the night of, the triple homicide and robbery have been detailed in the court's numerous prior opinions in this case, familiarity with which is presumed.

testified, that it was this defendant, Torey White, who lured Chaney to Jackson's farm on the night of the murders. (See Doc. 499 ¶ 12; Doc. 1361, 4/14/22 Coles Trial Tr. 162:13-15, 181:20-25).

Law enforcement moved quickly to indict and detain several individuals believed to be involved in the murders. A federal grand jury returned a five-count indictment in August 2016 in this case, charging codefendants Kevin Coles and Devin Dickerson with various drug-trafficking and firearms offenses occurring in spring and summer of 2016, during the runup to the triple homicide and robbery. Two months later, on October 12, 2016, a grand jury charged White in a separate case, criminal docket number 1:16-CR-294 (the "2016 docket"); that case also was assigned to the undersigned. See United States v. White, No. 1:16-CR-294, Doc. 1 (M.D. Pa. Oct. 12, 2016). On November 13, 2017, White pled guilty to one count of possession with intent to distribute at least 28 grams of crack cocaine and one count of possession of firearms in furtherance of that drug-trafficking activity, for conduct occurring in September and October of 2016. See id., Docs. 26, 57; see also id., Doc. 63 ¶¶ 6-8. The court sentenced White on February 13, 2018, to an aggregate term of 130 months' imprisonment, consisting of 70 months on the drug count, followed by a statutorily mandated consecutive term of 60 months on the firearm count. See id., Doc. 69.

The grand jury subsequently returned several superseding indictments in this case. The first added another drug charge against Coles and Dickerson. The grand jury then returned a second superseding indictment on December 20, 2018, adding multiple charges arising from the June 2016 triple homicide and robbery

against Coles, Dickerson, White, and eight others (Christopher Johnson, Jerell Adgebesan, Michael Buck, Kenyatta Corbett, Nicholas Preddy, Johnnie Jenkins-Armstrong, Terrance Lawson, and Tyrone Armstrong).  The grand jury returned the currently operative third superseding indictment in January 2020.  The third superseding indictment charges White as follows:

- Count One: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and Pinkerton v. United States, 328 U.S. 640 (1946);

- Count Two: Hobbs Act robbery, and aiding and abetting same, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

- Counts Three, Four, and Five: causing the deaths of Jackson, Cole, and Chaney, respectively, by using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness), and aiding and abetting same, in violation of 18 U.S.C. § 924(c) and (j) and 18 U.S.C. § 2;

- Count Six: conspiracy to cause the death of Chaney by using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness), in violation of 18 U.S.C. § 924(c), (j), and (o);

- Count Seven: conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958 and Pinkerton;

- Counts Eight, Nine, and Ten: murder of witnesses (Chaney, Jackson, and Cole, respectively), and aiding and abetting same, in violation of 18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2; and

- Count Eleven: conspiracy to murder witnesses (Chaney, Jackson, and Cole) in violation of 18 U.S.C. § 1512(k).

Following extensive pretrial motions practice, guilty pleas by multiple codefendants, and severance of Adgebesan's case for separate trial, the court scheduled a jury trial for Coles and White to begin on April 11, 2022.  We later severed Coles' and White's cases for trial as well, due to personal circumstances

impacting White's counsel that prevented them from preparing for trial. Coles

proceeded to trial as scheduled, and the jury returned guilty verdicts on all counts.

Following a telephonic conference with counsel for White and for the government,

the court scheduled White's trial for January 9, 2023, with a pretrial conference to

commence at 10:00 a.m. on December 14, 2022. On the morning of the pretrial

conference, with White present in the courtroom, the parties advised the court they

had reached a plea agreement, and the government filed a copy of the signed plea

agreement to the docket. Therein, White agreed to plead guilty to Count Two of the

third superseding indictment, aiding and abetting Hobbs Act robbery on June 25,

2016. (See Doc. 1527 ¶ 1). Relevant to the instant motion, the plea agreement

contained a sentencing stipulation pursuant to Federal Rule of Criminal Procedure

11(c)(1)(C); if accepted by the court, the agreement called for the court to sentence

White "to a term of imprisonment of 20 years that will be served concurrently with

the 130 month sentence the defendant is currently serving at 1:16-CR-294 that was

imposed on February 13, 2018." (See id. ¶ 10). The United States Probation Officer

assigned to the case reviewed the fully executed plea agreement and alerted the

court to a legal issue with the proposed binding sentence: a portion of the

defendant's sentence on the 2016 docket was imposed pursuant to 18 U.S.C.

§ 924(c), and the United States Supreme Court has held that a Section 924(c)

sentence cannot run concurrently with any other sentence. See United States

v. Gonzalez, 520 U.S. 1, 6 (1997).

Shortly thereafter the court called a meeting in chambers to alert counsel to the potential legal impediment to their proposed sentencing agreement.[2]  The meeting was attended by defense and government counsel, the assigned probation officer, the undersigned, and the undersigned's career law clerk.  The court explained the Gonzalez problem; counsel promptly conceded that they had failed to consider the issue and that it was an impediment to their intent—for White to receive a combined sentence of 20 years' imprisonment on this docket and the 2016 docket.  The parties also agreed the manner in which the Federal Bureau of Prisons ("BOP") had computed the combined sentence on the 2016 docket—whether it had first attributed White's time served to the Section 924(c) offense or to the drug offense—was crucial to resolving the issue.  Because defense counsel were in town only briefly, the court offered to contact the BOP to find out how it had structured the running of White's sentence which would provide counsel with an opportunity to discuss the issue; all counsel agreed the court should do so.  The undersigned's clerk spoke with a BOP representative who confirmed that (1) the BOP had sequenced White's drug sentence to run first, (2) White now was serving the Section 924(c) sentence, and (3) the BOP would not run any sentence imposed on this docket concurrently with the Section 924(c) sentence.  The clerk relayed this information to the undersigned and to counsel for the parties; the clerk also

---

[2] This chambers meeting is the centerpiece of counsel's instant motion; the court thus provides only a brief summary of the meeting and relevant exchanges here and offers a more extended account *infra*.

provided to the undersigned and to counsel a copy of the sentence computation sheet utilized by the BOP representative when she relayed White's sentence information.

After several hours of negotiations amongst themselves, the parties filed a revised plea agreement.  (<u>See</u> Doc. 1528).  The revised agreement was identical in all respects except that it now included a workaround for the <u>Gonzalez</u> problem: if accepted by the court, the revised plea agreement called for the court to sentence White "to a term of imprisonment of 138 months that will be served consecutively to the sentence of 130 months the defendant is currently serving at 1:16-CR-294 that was imposed on February 13, 2018."  (<u>See</u> <u>id.</u> ¶ 10).  The court convened a change of plea hearing that afternoon, during which the court accepted White's plea of guilty but deferred acceptance of the Rule 11(c)(1)(C) provisions of White's revised plea agreement pending receipt and review of an expedited presentence report.

The court received the presentence report on January 13, 2023.  The report calculated an offense level of 43, a criminal history category of VI, and a Guidelines term of imprisonment of life.  However, by virtue of the statutory maximum term of imprisonment of 20 years, the Guidelines sentence was capped at 240 months.  The court convened a telephonic presentence conference with counsel for White and for the government on January 19, during which the court alerted counsel to its intent to reject the plea agreement's proposed binding sentence at the sentencing hearing scheduled for the following week.  On January 23, 2023, in full compliance with Rule

11(c)(5), the court advised White in open court that the court was rejecting the binding sentencing recommendation, put the reasons for that decision on the record, and gave White the opportunity to withdraw his guilty plea, which he did. The court then slated the case for trial on May 1, 2023.  Eight days later, defense counsel filed the instant motion alleging the undersigned violated Federal Rule of Criminal Procedure 11(c)(1) by my impermissible involvement in the parties' plea negotiations.

## II.   __Legal Standard__

Pursuant to 28 U.S.C. § 455, a district judge must disqualify himself from any proceeding in which "his impartiality might reasonably be questioned."  See 28 U.S.C. § 455(a).[3]  We must evaluate motions to disqualify pursuant to Section 455 "on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance."  See Liteky v. United States, 510 U.S. 540, 548 (1994) (emphasis omitted).  The recusal inquiry thus is "made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances."  See Cheney v. U.S. Dist. Ct. for Dist. of D.C., 541 U.S. 913, 924 (2004) (Scalia, J., mem.) (citation and emphasis omitted).  If that reasonable, informed observer "would conclude that the judge's impartiality might reasonably be questioned," the judge

---

[3] Defense counsel do not cite to Section 455 in their motion or briefing. Because Section 455 governs disqualification of judicial officers from proceedings pending before them, we construe the instant motion pursuant to Section 455 based upon alleged violations of Federal Rule of Criminal Procedure 11(c)(1).  Cf. United States v. Kennedy, 682 F.3d 244, 258-60 (3d Cir. 2012) (relying on Section 455 in ordering reassignment on remand when district judge's conduct, including "arguabl[e]" violation of Rule 11(c)(1), caused appearance of partiality).

must recuse.  See *In re* Kensington Int'l Ltd., 353 F.3d 211, 220 (3d Cir. 2003) (citing

Edelstein v. Wilentz, 812 F.2d 128 (3d Cir. 1987)).  Equally important, however, is a

judge's duty not to recuse when there is no legitimate reason to do so.  See Conklin

v. Warrington Township, 476 F. Supp. 2d 458, 463 (M.D. Pa. 2007) (Conner, J.)

(collecting cases); see also CODE OF CONDUCT FOR UNITED STATES JUDGES, Canon

3A(2) ("A judge should hear and decide matters assigned, unless disqualified.").

Accordingly, "[d]iscretion is confided in the district court in the first instance to

determine whether to disqualify himself because the judge presiding over a case

is in the best position to appreciate the implications of those matters alleged in a

recusal motion."  United States v. Ciavarella, 716 F.3d 705, 720 (3d Cir. 2013)

(quoting *In re* Kensington Int'l Ltd., 353 F.3d at 224) (alteration in original).

## III.  Discussion

The starting point for our analysis is Federal Rule of Criminal Procedure

11(c)(1).  Rule 11(c)(1) provides counsel for the government and the defendant "may

discuss and reach a plea agreement," and "[t]he court must not participate in these

discussions."  See FED. R. CRIM. P. 11(c)(1).  The prohibition on judicial participation

in plea negotiations serves three purposes:

> First, it diminishes the possibility of judicial coercion
> of a guilty plea, regardless whether the coercion would
> actually result in an involuntary guilty plea.  Second, the
> judge's involvement in the negotiations is apt to diminish
> the judge's impartiality.  By encouraging a particular
> agreement, the judge may feel personally involved, and
> thus, resent the defendant's rejection of his advice.
> Third, the judge's participation creates a misleading
> impression of his role in the proceedings.  The judge's
> role seems more like an advocate for the agreement than
> a neutral arbiter if he joins in the negotiations.

United States v. Brown, 595 F.3d 498, 520 (3d Cir. 2010) (quoting United States
v. Baker, 489 F.3d 366, 370-71 (D.C. Cir. 2007)).  Our court of appeals has explained
that, at bottom, the rule "seeks to avoid a situation in which a court places pressure
on a defendant to plead guilty involuntarily."  See id. at 521.

The central questions implicated by White's motion are what constitutes
"participation" in plea agreement "discussions" in the first instance, and when
do those "discussions" end for purposes of the bar on judicial involvement?  The
latter inquiry is particularly important here because, as the defendant concedes,
(see Doc. 1594 at 20), Rule 11 elsewhere imposes on judges a concomitant obligation
to scrutinize a finalized plea agreement and to review its terms with the defendant
to assess whether the defendant's guilty plea is knowing and voluntary.  See FED. R.
CRIM. P. 11(b); In re Burnett, 537 F. App'x 30, 32 (3d Cir. 2013) (nonprecedential)
(noting "the district court is expected to take an active role in evaluating a plea
agreement, once it is disclosed." (quoting United States v. Crowell, 60 F.3d 199, 204
(5th Cir. 1995))).

Our court of appeals has not had occasion to speak to either question at
great length.  The court first addressed the issue in United States v. Ebel, 299 F.3d
187 (3d Cir. 2002), in which it determined the district court's attempts to assist a
pro se defendant in navigating plea negotiations crossed the Rule 11(c)(1) line but,
ultimately, amounted to harmless error.  See Ebel, 299 F.3d at 191.  The situation
in Ebel is unique; the decision does reveal, however, that our court of appeals views
Rule 11(c)(1) primarily as a safeguard against coerced pleas.  See id. at 191-92.  The
court of appeals later offered clarity as to what precisely constitutes impermissible

judicial participation in plea talks: in <u>Brown</u>, the court found our colleague, Judge Sylvia H. Rambo, did not violate Rule 11(c)(1) by expressing displeasure with the parties' plea agreement in a letter to counsel and during an in-chambers meeting when neither "took place until *after* Brown and the government had finalized the plea agreement."  <u>See</u> <u>Brown</u>, 595 F.3d at 521 (citing <u>Baker</u>, 489 F.3d at 371) (emphasis added).  The court noted that, by the time Judge Rambo made negative comments about the agreement, "the plea negotiations were over and there was no risk that judicial pressure was going to influence the outcome of those negotiations."  <u>Id.</u>

<u>Brown</u>'s logic applies with equal force here.[4]  By the time the undersigned met with counsel in chambers on December 14, 2022, White and the government had completed their plea negotiations.  They had struck, signed, and submitted to the court a finalized plea agreement in which White agreed to enter a guilty plea to aiding and abetting Hobbs Act robbery on June 25, 2016.  (<u>See</u> Doc. 1527).  The court was not involved in those negotiations.  The court spoke to counsel only after the parties had finalized the agreement and had filed it on the docket.  There is "no risk that judicial pressure" influenced White's decision to plead guilty.  <u>See</u> <u>Brown</u>, 595 F.3d at 521; <u>see also</u> <u>Ebel</u>, 299 F.3d at 191-92.

---

[4] The defendant claims <u>Brown</u> is distinguishable for three reasons, two of which are subsumed in the analysis that follows.  The third purported distinction—that <u>Brown</u> arose on appeal and therefore applied the harmless-error standard of review—is felled by the court of appeals' observation that its "result would be the same regardless of whether we exercise plain error or plenary review."  <u>See</u> <u>Brown</u>, 595 F.3d at 519 n.25.

Defense counsel's efforts to manufacture distinctions between <u>Brown</u> and this case, and to analogize to others, are marked by gross mischaracterization and selective omission of events that occurred after the court received the finalized plea agreement. The initial Rule 11(c)(1)(C) plea agreement, if accepted by the court, would have required the court to impose an unlawful sentence. Namely, it would have required the court to run White's sentence on this docket concurrently with his Section 924(c) sentence on the 2016 docket, a structuring prohibited by the United States Supreme Court's decision in <u>United States v. Gonzalez</u>, 520 U.S. 1, 6 (1997) (holding consecutive mandatory minimum terms attending Section 924(c) convictions must be served consecutively to "any other term of imprisonment," including any sentences on other dockets). The assigned probation officer brought the <u>Gonzalez</u> issue to the court's attention, and the court immediately invited counsel to chambers to alert them to what appeared to be an unanticipated legal impediment to their agreement.[5]

---

[5] The court's recollection of what transpired next differs vastly from that of defense counsel. The summary of events that follows is based on the collective recollection of the court, the court's clerk, and the probation officer, much of which is consistent with the version of events recalled by the government. (<u>See</u> Doc. 1582 at 2-6, 16-17).

After exchanging professional pleasantries,[6] the undersigned identified the legal issue with the proposed binding sentence, to wit: <u>Gonzalez</u> would prohibit the BOP from running White's sentence in this case concurrently with the Section 924(c) sentence on his 2016 docket.  Counsel conceded they had not contemplated this issue.  Counsel for the government suggested the court could accept the guilty plea and worry about the <u>Gonzalez</u> problem later, but the court declined, noting the parties had signed a Rule 11(c)(1)(C) binding plea agreement, which, if accepted, could constrain the court's ability to adjust the agreed-upon sentence later.  The probation officer observed that if White had already completed the Section 924(c) portion of his sentence on the 2016 docket and was now serving the drug portion of

---

[6] I thanked counsel for their diligent efforts in attempting to resolve the case.  Defense counsel claims that I gave preliminary approval to the binding plea agreement by sanctioning it as either "reasonable" or "fair."  Although the meeting was not transcribed, I am confident that I did no such thing.  To the contrary, I engaged in platitudes to place counsel at ease.  I am equally confident that if I made any general observation of the type mischaracterized by counsel, it was accompanied by caveated language consistent with the posture of the binding plea agreement review and the court's historical practice; just as I did on the record of the December 14, 2022 change of plea hearing, it is my standard procedure to studiously avoid commenting on or reaching conclusions regarding the reasonableness or propriety of binding plea agreements before I receive and review the presentence report.  The court of appeals, in a nonprecedential opinion, has agreed with the Ninth Circuit that "Rule 11(c)(1) 'does not establish a series of traps for imperfectly articulated oral remarks.'"  <u>See</u> <u>United States v. Weinstein</u>, 658 F. App'x 57, 60-61 (3d Cir. 2016) (nonprecedential) (quoting <u>United States v. Frank</u>, 36 F.3d 898, 903 (9th Cir. 1994)).  In any event, I am certain that I did not provide counsel with any assurance whatsoever that I would accept the binding sentencing recommendation of the plea agreement.  Hence, defense counsel's interpretation of my comments as either explicitly or implicitly approving the parties' proposed sentence was and is objectively unreasonable.  (<u>Cf.</u> Doc. 1582 at 17 (brief of government counsel stating "[t]he court did not give any indication that it would ultimately agree to be bound by the terms of the agreement if the parties did reconstruct their agreement")).

that sentence, there would be no <u>Gonzalez</u> problem; but if he was now serving the Section 924(c) portion, the BOP would tack the parties' proposed 20-year sentence on this docket onto the end of the Section 924(c) sentence, with the result being White would receive none of the time credit the parties' agreement intended.

The court offered to recess proceedings to give the parties time to explore possible solutions to the facially impermissible proposal; the parties reported they would like to do so.  Because all decisionmakers were already assembled in the courthouse, and recognizing White's presence in the building would allow defense counsel (who are not local) to explain the problem in person, the court also offered to contact the BOP to get a quick answer to whether the BOP had run White's drug sentence or the Section 924(c) sentence first; counsel agreed the court should do so. The court excused the parties to conduct their separate discussions, noted the court would remain available throughout the day for a plea hearing if necessary, and reminded counsel the court was prepared to proceed with a pretrial conference if the parties were unable to sort out the issue.  Neither defense counsel nor government counsel expressed an assurance that a new plea agreement could be easily negotiated.

The court's clerk[7] subsequently spoke with a BOP representative who advised the BOP had sequenced the 2016 drug sentence to run first; the drug term had ended on approximately September 30, 2021; White thereafter began serving

---

[7] The court agrees with counsel for the defendant that the conduct of the court's clerk is attributable to the court.  <u>See, e.g.</u>, <u>United States v. Kraus</u>, 137 F.3d 447, 456 (7th Cir. 1998).

the 60-month Section 924(c) sentence; and, consistent with <u>Gonzalez</u>, the BOP automatically would run any sentence imposed on this docket to run consecutively to the Section 924(c) sentence White was then serving. The BOP representative also emailed the clerk a sentence computation sheet confirming the information she had provided; the court's clerk apprised the undersigned and the parties of this information and forwarded the computation sheet to all counsel.

With no further communication from the court, the parties began to negotiate a new plea agreement and, later that day, presented a revised agreement to the court. This second plea agreement was identical in every respect to the first except the parties adjusted the agreed-upon prison term downward to account for the fact that the BOP necessarily would run the sentence on this docket consecutively to White's existing sentence. The court convened a change of plea hearing during which it accepted White's guilty plea but deferred acceptance of the binding sentencing agreement until after the court reviewed the presentence report.

These circumstances stand in stark contrast to every case cited by defense counsel as an exemplar of impermissible judicial participation. The court did not initiate plea discussions; *per contra*, discussions had begun *and concluded*, and the plea agreement was signed and filed, before the court spoke with counsel about it. <u>Cf.</u> <u>United States v. Harrell</u>, 751 F.3d 1235, 1239 (5th Cir. 2014) (improper judicial participation when "district court instigated—without any mention of possible plea agreements from the parties—the plea-related discussions"); <u>Baker</u>, 489 F.3d at 373 (same when judge "unilaterally initiated and engaged in a lengthy plea discussion" with defendant after pretrial hearing on eve of trial); <u>United States v. Barrett</u>, 982

14

F.2d 193, 194 (6th Cir. 1992) (same when judge initiated conference for sole purpose of facilitating plea), abrogated on other grounds by United States v. Davila, 569 U.S. 597 (2013).  The court did not encourage or pressure the parties to enter into plea negotiations or to revise the final plea agreement once submitted.[8]  Cf. Baker, 489 F.3d at 373 (improper participation when judge, inter alia, "thrice encourag[ed] the parties to 'talk again' and 'see if we can resolve this case'" in order to "encourage a plea").  The court did not comment on or propose preferred terms for either plea agreement, cf. In re United States, 32 F.4th 584, 592-93 (6th Cir. 2002) (improper

---

[8] White's counsel must, of course, advocate zealously on behalf of their client, and this court has no objection to being asked to examine its conduct or to recuse when appropriate.  What the court will not countenance, however, is blatant mischaracterization of its actions.  The court will assume for defense counsel's benefit that the misrepresentations in their briefing are the result of failed recollection and not intentional distortion.  Nonetheless, several of counsel's misstatements require express correction.  Counsel claim, for example, that the "entire purpose of the chambers conference *was for the Court to help the parties reshape [White's] deal*."  (Doc. 1594 at 20-21 (emphasis added)).  Similarly, counsel claim the undersigned "*directed* the parties to see if they could find a different way to achieve the same result," (Doc. 1575 at 13 (emphasis added)), and go so far as to allege "the parties were expected *to reconstruct the agreement as the Court directed*," (id. at 4 (emphasis added)).  The misrepresentations go on.  (See, e.g., id. at 2 (claiming "Judge Conner *instructed the parties to confer to find a different way to achieve the same result*" (emphasis added)); id. at 12 n.12 (claiming "the Court convened an off-the-record meeting in chambers in which *it urged the parties to restructure the agreement* in a manner that would not run any portion of Mr. White's sentence concurrent with his mandatory minimum 924(c) time" (emphasis added)); Doc. 1594 at 4 (claiming "the parties were expected to reconstruct the agreement as the Court directed")).  These statements and all others like them in counsel's briefing are wholly inaccurate; the court did nothing more than identify a potential legal defect in the agreement *the parties* had negotiated and offer them time, if they desired it, to discuss and possibly cure that defect amongst themselves.  As the defendant's own cited case law holds, there is nothing improper in the court suggesting generally that the parties could likely find a resolution.  See Kraus, 137 F.3d at 454 (noting court's acknowledgment "that the parties of course might be able to reach an agreement that was acceptable . . . obviously [was] nothing extraordinary").

participation for court to initiate discussions and warn counsel plea agreements containing appellate waivers would not be approved); Harrell, 751 F.3d at 1239-40 (same when court initiated discussions and proposed specific sentence in attempt to resolve plea impasse), and did not opine on the merits of the case, cf. Barrett, 982 F.2d at 194, 195 (same when judge made "direct comment on the facts of the case during the bargaining process rather than after the parties had worked out their bargain").

Nor did this court influence a subsequent agreement by expressing or implying that it would agree to be bound by a hypothetical revised agreement. Cf. Kraus, 137 F.3d at 456 (improper judicial participation when "terms of an inchoate plea agreement were floated before the court, and only after a favorable response was received did the parties finalize their agreement"). Defense counsel claims the court's statement at the outset of the meeting, that the initial agreement appeared to be "fair" or "reasonable," necessarily influenced counsel's thinking *vis-à-vis* any revised agreement; counsel somehow arrived at the impression that any agreement similar to the first would receive indiscriminating court approval. (See Doc. 1594 at 2). This purported understanding, particularly by experienced counsel, was objectively unreasonable: not only were the court's comments as to the first agreement highly generalized and caveated, see *supra* p. 12, note 6, the court also never—with respect to the first agreement or any hypothetical revised agreement— intimated which way it was inclined regarding the binding sentencing proposal.

White's counsel come closer, from a procedural standpoint, in their reliance on *In re* Benvin, 791 F.3d 1096 (9th Cir. 2015). There, the court's involvement arose

after the parties submitted a finalized plea agreement to the court—but even that decision is distinguishable in material ways: the district court "required" the parties to modify particular terms regarding restitution to victims on dismissed counts and conditioned acceptance of the plea agreement on the ordered revisions. <u>See</u> <u>In re Benvin</u>, 791 F.3d at 1103. So too for <u>United States v. Miles</u>, 10 F.3d 1135 (5th Cir. 1993), where the court rejected the proposed binding plea agreements as too lenient at sentencing then described the hypothetical agreements it would approve, stating only plea agreements which would have the defendants incarcerated for the rest of their respective lives—<i>viz.</i>, "another 20 years" for the first defendant and "another 40 years" for the second—would be acceptable. <u>See</u> <u>Miles</u>, 10 F.3d at 1138-40 (concluding Rule 11(c)(1) bars such "full-blown judicial participation in crafting a new agreement once a tendered agreement is rejected"). These decisions establish a Rule 11(c)(1) violation can arise even after a plea agreement has been finalized. Beyond that, they are helpful only for distinction, demonstrating what an actual Rule 11(c)(1) violation looks like and illustrating by contrast that nothing of the sort occurred here.[9]

---

[9] White implies the undersigned proposed a specific term for the hypothetical revised plea agreement by observing during the chambers meeting that the solution to their problem might require an agreement for a prison term of something less than 20 years. (<u>See</u> Doc. 1594 at 2). I did indeed make such an observation, but it was nothing more than a statement of mathematical fact, given the parties' stated intentions for the aggregate length of White's prison sentences and the implications of the <u>Gonzalez</u> decision.

Defense counsel's collection of cases betrays additional, and material, distinctions.  First, each of the cited cases involves a judge raising subjective concerns, in their capacity as future sentencer, to the proposed or finalized plea agreement, or to other negotiated, discretionary terms to which the judge objected. Here, *per contra*, the court identified an objective, legal defect in the parties' plea agreement that everyone agreed was an unforeseen barrier to effectuating the parties' intent; the parties then chose, with the court's permission but without the court's involvement, to try to solve the problem.  *Second*, and relatedly, nothing material actually changed between the two iterations of the plea agreement.  The parties wanted a binding sentence that would result in a release date approximately 20 years from the date White was detained on this docket; the first version of the plea agreement failed to accomplish that due to the parties' failure to consider Gonzalez; and the second version merely tweaked the proposed binding sentence to effectuate the parties' intent.

That none of the purposes animating Rule 11(c)(1) are implicated here further confirms no violation has occurred.  See Brown, 595 F.3d at 520 (citing possibilities of coercion, diminished impartiality, and misleading impression of judge's role as bases for bar (quoting Baker, 489 F.3d at 370-71)).  As explained *passim*, there was neither influence nor coercion nor any appearance of it; the parties reached a plea agreement entirely on their own.  This quite clearly is not a situation in which a defendant, not otherwise disposed to pleading guilty, was coerced to do so by the court.  Cf. Ebel, 299 F.3d at 192 (underscoring defendant "was induced to do nothing beyond what he had already stated he would agree to

do"). No one could reasonably believe the court compromised its impartiality under these circumstances. Cf. United States v. Ekwerekwu, 50 F.3d 1033, 1033 (5th Cir. 1995) (identifying defendant's "*reasonable* perception" of judge's potential lack of objectivity as consideration (emphasis added)). The court did not weigh in on the merits of the case, was not made privy to the party's respective motivations for opting to resolve the case by guilty plea, and learned nothing from the chambers conference it did not already know about the case.[10]

Finally, assuming *arguendo* a Rule 11(c)(1) violation did occur, we reject defendant's conclusion that recusal is warranted. The usual Rule 11(c)(1) violation results in a defendant arguing on appeal that his guilty plea was coerced and involuntary, and so much of the case law contemplating the appropriate remedy centers on *vacatur vel non* of the guilty plea and whether to remand the case to a new judge. See, e.g., Barrett, 982 F.2d at 196. The Supreme Court has made clear,

---

[10] United States v. Adams, 634 F.2d 830 (5th Cir. 1981), which defense counsel quote from to support their compromised-neutrality argument, is inapposite and, in fact, supports this court's analysis by distinction. In Adams, the court reasoned through how to remedy a Rule 11(c)(1) violation—the judge participated in plea discussions with counsel and tentatively approved a hypothetical arrangement, then later offered a plea agreement on her own initiative—when the defendant ultimately pled not guilty and proceeded to trial. See Adams, 634 F.2d at 837. The defendant *sub judice* leans heavily on Adams, noting the court's observations that even when a Rule 11(c)(1) violation does not result in a guilty plea, the violation can taint a subsequent trial or sentencing: a judge might "resent" the defendant who rejects a plea the judge helped craft and could have their objectivity compromised by hearing the defendant's confession or other incriminating statements during the plea negotiations. See Adams, 634 F.2d at 840-41. Those concerns may well arise when a judge *actually participates* in the parties' bargaining and the defendant rejects terms proposed by the judge; but when, as here, the court is separated from the substantive bargaining process, and when it is the court, not the defendant, who rejects the plea agreement, none of the concerns identified in Adams could fairly be said to apply.

however, that a Rule 11(c)(1) violation is not a structural error triggering automatic *vacatur* of the resulting guilty plea.  See Davila, 569 U.S. at 610-11.  In rejecting a *per se* rule, the Court explained the "particular facts and circumstances matter," and therefore tasked lower courts confronting the issue to ask, based on the "case-specific circumstances," whether the defendant would have pled guilty but-for the alleged violation.  See id. at 609, 612.

Of course, there is no guilty plea to vacate here because the court ultimately rejected the revised plea agreement and allowed White to withdraw his guilty plea; in other words, we are back at square one.  Cf. Brown, 595 F.3d at 520-21 (finding any Rule 11(c)(1)(C) error to be harmless when court rejected plea agreement and defendant exercised right to proceed to trial).  But Davila's reasoning is instructive in our recusal analysis.  The decision requires courts to examine the purportedly problematic conduct "not in isolation, but in light of the full record."  See id. at 612. Viewed through this lens, which is the same one applicable to the broader recusal inquiry, see Cheney, 541 U.S. at 924, recusal is not warranted.  The undersigned harbors no bias toward the defendant, nor could what transpired on December 14, 2022, support, in the mind of a reasonable observer, see Cheney, 541 U.S. at 924; Ekwerekwu, 50 F.3d at 1033, any inference of impartiality.[11]  The fact that the court

---

[11] Indeed, although the court's "good faith" is irrelevant in determining whether a Rule 11(c)(1) violation occurred in the first place, see, e.g., In re United States, 32 F.4th at 594; Baker, 489 F.3d at 376; Harrell, 751 F.3d at 1240, we note for purposes of this portion of our analysis the court's intervention actually benefitted the defendant: the legal impediment of Gonzalez, which defense counsel did not foresee, exposed White to roughly seven more years' imprisonment than he and defense counsel had anticipated.

heard the defendant's admissions during the plea hearing, and later cited those admissions in rejecting the Rule 11(c)(1)(C) plea agreement as too lenient, likewise is no reason to recuse.  Opinions formed by a judge based on information learned in official proceedings will not support disqualification unless they reveal "deep-seated favoritism or antagonism that would make fair judgment impossible," see Ciavarella, 716 F.3d at 719 (quoting Liteky, 510 U.S. at 553 n.2), and the defendant does not (and could not) allege the court *ever* has demonstrated antagonism toward him.[12]  To put a very fine point on it: there is no basis for recusal in this case.[13]

---

[12] Defense counsel claim "[i]t is impossible to know what the proffer of facts would have included if a different plea agreement—one in which the Court had been uninvolved—had been the basis of the change of plea," the implication being the court's actions coerced White to admit to facts he was not otherwise inclined to concede.  (See Doc. 1575 at 18-19).  This argument defies logic, since the substantive charge underlying the first and second plea agreements was the same.  We flatly reject counsel's attempt to distinguish this case by implying the court somehow duped the defendant into making more damning admissions of record than he otherwise might have.  It stands to reason that White's admissions would have been identical because the plea agreements, with exception of the sequencing of White's various prison terms, were identical.

[13] Our court of appeals has observed that a trial judge's exercise of discretion in the recusal context is given particular weight when the judge "has presided over (i) an extraordinarily complex litigation (ii) involving a multitude of parties (iii) for an extended period of time."  Ciavarella, 716 F.3d at 720 (quoting In re Kensington Int'l Ltd., 353 F.3d at 224).  As of this writing, this prosecution has been pending before this court for nearly seven years.  The court has issued 15 memorandum opinions comprising more than 400 pages, (see Docs. 135, 615, 756, 766, 782, 906, 943, 945, 954, 1011, 1018, 1023, 1032, 1166, 1287, 1511), and hundreds of orders; indeed, this memorandum marks docket entry number 1600 in the case.  The court has reviewed thousands of pages of briefing, transcripts, and exhibits, and has presided over 10 hours of suppression hearings and a three-week-long jury trial.  We make this observation to demonstrate not only that the court is well-suited to appreciate the implications of defense counsel's allegations, but also to underscore the significant strain on judicial resources that would be caused by reassignment at this late juncture.

IV.   **Conclusion**

Defense counsel's motion represents a classic attempt to exalt a rule's form over its substance. The motion rests on absurd propositions (*e.g.*, that White was not disposed to pleading guilty to aiding and abetting Hobbs Act robbery, despite having signed a plea agreement wherein he agreed to plead guilty to that offense) and nonsensical insinuations (*e.g.*, that the court coerced White into signing a plea agreement for the purpose of obtaining factual admissions to use against White in later rejecting the very agreement the court purportedly desired). For the reasons set forth at length herein, we conclude there has been no Rule 11(c)(1) violation in this case and that, even if there had been, recusal is not required. The defendant's motion seeking to disqualify the undersigned will be denied.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:      March 8, 2023