## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **TOREY WHITE,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Defendant Torey White proceeded to trial in May of this year on an 11-count indictment charging him with various inchoate and substantive offenses related to the murders of Wendy Chaney, Phillip Jackson, and Brandon Cole on June 25, 2016.  After two days of deliberations, the jury returned a verdict of not guilty as to all but three counts; those counts charged White with murder of a witness in violation of 18 U.S.C. § 1512(a)(1)(C), as to each of the three homicide victims.  White now moves for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Federal Rule of Criminal Procedure 33, based on the court's error in communicating *ex parte* with jurors during deliberations, the insufficiency and weight of the evidence, and alleged <u>Brady</u>[1] violations by the government.  We agree with White that, however well-intentioned, our *ex parte* communications with two jurors were in error and require a new trial.

---

[1] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

I.    **Background**

The criminal investigation and charges in this case originate with a triple homicide and robbery on June 25, 2016.  The third superseding indictment identifies the homicide victims as Wendy Chaney, Phillip Jackson, and Brandon Cole.  The murders and robbery occurred in a barn on Jackson's farm, located at 11026 Welsh Run Road in Mercersburg, Franklin County, Pennsylvania.

Chaney was the target of the murders.  The government's theory was that White and codefendants Kevin Coles and Devin Dickerson learned Chaney had been cooperating with law enforcement regarding their drug-trafficking activities and conspired to have her killed.  Both White and Coles had personal and drug-dealing relationships with Chaney.  Evidence proving the identity of all members of the conspiracy to kill Chaney is largely circumstantial and precisely how that conspiracy was put into motion is very much in dispute.  What is clear, however, is that on the morning of June 25, 2016, codefendants Michael Buck and Kenyatta Corbett travelled from Hagerstown, Maryland, to Jackson's farm to conduct reconnaissance.  The pair then returned to Hagerstown and went their separate ways; Buck to find heroin to get high, and Corbett to Baltimore with codefendant Jerell Adgebesan to recruit Adgebesan's contacts there—codefendants Christopher Johnson, Nicholas Preddy, Johnnie Jenkins-Armstrong, and now-deceased coconspirator Deandre Coleman, all known members of the Black Guerilla Family or BGF—to murder Chaney.  Johnson and his crew signed on, and the larger group returned to Hagerstown for an impromptu planning meeting at Buck's home, before Johnson, Corbett, Preddy, Jenkins-Armstrong, and Coleman departed for

Jackson's farm.  According to the government, Johnson was promised a bounty to
be found at the farm—$20,000 in cash as well as drugs and guns—in exchange for
the hit.  The government alleged it was White who ensured Chaney would be at
Jackson's farm that night.

The operative charging document—the third superseding indictment—
charges White as follows:

- Count One: conspiracy to commit Hobbs Act robbery in violation of
  18 U.S.C. § 1951(a) and Pinkerton v. United States, 328 U.S. 640 (1946);

- Count Two: Hobbs Act robbery, and aiding and abetting same, in violation
  of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

- Counts Three, Four, and Five: causing the deaths of Jackson, Cole, and
  Chaney, respectively, by using, brandishing, and discharging a firearm
  during and in relation to a crime of violence (Hobbs Act robbery and
  killing a witness), and aiding and abetting same, in violation of 18 U.S.C.
  § 924(c) and (j) and 18 U.S.C. § 2;

- Count Six: conspiracy to cause the death of Chaney by using, brandishing,
  and discharging a firearm during and in relation to a crime of violence
  (Hobbs Act robbery and killing a witness), in violation of 18 U.S.C.
  § 924(c), (j), and (o);

- Count Seven: conspiracy to commit murder for hire in violation of
  18 U.S.C. § 1958 and Pinkerton;

- Counts Eight, Nine, and Ten: murder of witnesses (Chaney, Jackson,
  and Cole, respectively), and aiding and abetting same, in violation of
  18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2; and

- Count Eleven: conspiracy to murder witnesses (Chaney, Jackson, and
  Cole) in violation of 18 U.S.C. § 1512(k).

(See Doc. 499).  White is not charged as a principal on any count.  At trial, the
government proceeded on aiding-and-abetting and Pinkerton theories of criminal

liability on Counts Two and Eight, and Pinkerton liability alone on Counts Three, Four, Five, Nine, and Ten.

Trial began with jury selection on May 1, 2023, and the jury heard evidence over the next 11 days. White maintained his innocence, and he had answers for significant pieces of evidence the government adduced. For example, the government leaned heavily on cooperating codefendant Michael Buck, who testified White appeared briefly at the planning meeting at Buck's home and assured the group "that bitch" would be at the farm later that night. (See Doc. 1760, 5/5/23 Trial Tr. 887:18-888:13, 893:9-897:5). White's counsel underscored the antipodal testimony of admitted triggerman Christopher Johnson, who told the jury White was not at the planning meeting; he had never seen White before taking the stand at trial; and it was Buck, not White, who provided details about the farm and assured the group Chaney would be there. (See id. at 817:2-818:14). White also produced an alibi witness, Tontalayia Snead, who testified she met White for the first time early in the day on June 25 and the pair decided to go on a date later that afternoon; she and White were in Jackson's green pickup truck on their way to ride four-wheelers at the time of the planning meeting and did not stop at Buck's house; and she would have remembered the detour if it happened, since she previously lived just one street over from Buck. (See Doc. 1767, 5/16/23 Trial Tr. 2324:8-2331:12).

The government offered testimony from Angela Barney, Corbett's then-paramour. Barney told the jury she and Corbett briefly broke off from the rest of the group *en route* to Jackson's farm and stopped at a gas station on Cearfoss Circle,

where Corbett approached a green truck with a four-wheeler in its bed to speak for "[f]ive, ten minutes" with the driver in a side parking lot—the implication being this could have been the point at which White confirmed for the others that Chaney was at or on her way to the farm.  (See Doc. 1759, 5/4/23 Trial Tr. 684:5-688:5).  Snead testified she and White did stop at Cearfoss Circle for gas and White went into the store to purchase blunts, but Snead was unequivocal that she remained in the vehicle at the gas pump, not a side parking lot, and no one approached the vehicle to speak with White.  (See 5/16/23 Trial Tr. 2333:1-2336:6).  When shown a photo of Corbett, Snead said she had never seen him before.  (See id. at 2335:21-23).  Both sides also presented expert witnesses, who offered competing testimony regarding which witnesses' accounts, and which party's theory of the events of June 25, were more consistent with cell phone geolocation data.  (See generally Doc. 1766, 5/15/23 Trial Tr. 2082:25-2260:11 (government expert); 5/16/23 Trial Tr. 2389:6-2463:15 (defense expert)).

The balance of the government's case rested largely on the testimony of Martin Kettula, who lived across the street from Jackson's farm and observed some of the events of June 25, and two jailhouse informants—Wesley Garner and Dennis Sneads—who testified White confessed his involvement in certain of those events to them.  (See generally 5/4/23 Trial Tr. 581:4-654:14 (Kettula); Doc. 1758, 5/3/23 Trial Tr. 464:19-494:3 (Garner); 5/4/23 Trial Tr. 503:16-580:15 (Garner continued); Doc. 1764, 5/11/23 Trial Tr. 1791:8-1854:17 (Sneads); Doc. 1765, 5/12/23 Trial Tr. 1860:17-1894:10 (Sneads continued)).  Kettula testified Jackson's truck returned to the farm after the first two gunshots—those that killed Jackson and Cole—rang out, but five

minutes before the final two shots that killed Chaney—suggesting White was on the Jackson property at the time Chaney was killed.  (See 5/4/23 Trial Tr. 598:19-603:24). Garner testified he was housed with White in pretrial detention; he told the jury that, after other inmates started believing White was a "snitch," White showed Garner a police report for the murders and said White and "K," the other person Chaney was in a relationship with, "put the bag up and got the BGF to get her killed."  (See 5/3/23 Trial Tr. 471:2-474:24, 480:19-483:19).  Sneads told the jury that White said he asked Chaney to meet him at Jackson's farm on the night of the murders and that he claimed "the victims' throats were slit" and that he personally shot Chaney, then Jackson and Cole.  (See 5/11/23 Trial Tr. 1807:24-1809:25, 1822:3-1823:13).  Sneads also told the jury White said he had participated in a drug deal with a "guy from New York and Wendy," presumably referencing Coles, who was from New York.  (See id. at 1803:25-1804:22).  Defense counsel cross-examined each of these witnesses, highlighting certain inconsistencies and, as to Garner and Sneads, offering impeachment evidence.

Both parties offered substantial closing arguments, and the jury began deliberations at 4:30 p.m. on May 17.  The jury deliberated for over two hours before adjourning for the evening and returning for a second day of deliberations at 9:00 a.m. the next day.  At 12:45 p.m., the courtroom deputy received a handwritten note from the jury room.  The note stated "3 of us have a concern that one of the jurors . . . has prior knowledge or knowledge obtained outside the courtroom about this case" and was signed by a single juror.  (See Doc. 1716).

In light of the vague nature of the note's allegations, I brought the jury foreperson to a conference room near the jury room simply to seek clarification before bringing the issue to counsel.  This initial discussion and the two subsequent discussions described below were off the record.  I ascertained that the foreperson had written the note, and she quickly elaborated on the nature of her concerns.  The foreperson relayed that the juror mentioned in the note had made a remark about Adgebesan which the foreperson thought alluded to information not of record.  I then met with the subject juror, who explained he had been referring to testimony from the case agent, Drug Enforcement Administration Special Agent Keith Kierzkowski, that someone was "dead."  The juror thought that person was Adgebesan, but their recollection was wrong—the record reflects Agent Kierzkowski was referring to unindicted and since-deceased coconspirator Deandre Coleman.  (See 5/12/23 Trial Tr. 2018:20-2019:7).  I explained as much to the juror and returned them to the jury room, before circling back with the jury foreperson to explain the misunderstanding to them as well.  I advised the foreperson that it was my determination the subject juror did not possess outside information and there simply had been a miscommunication.  Because I sensed tension had arisen in the jury room based on both jurors' comments, I instructed the foreperson to welcome the subject juror back into the fold to continue the jury's work.  The jury returned to deliberations.

I immediately directed my staff to assemble counsel in the courtroom, and we reconvened, on the record, at 12:58 p.m.  The following discussion ensued:

7

THE COURT:      All right.  The jury sent a note signed by the foreperson, Three of us have a concern that one of the jurors has prior knowledge or knowledge obtained outside the courtroom about this case.

I brought the foreperson in and voir dired the foreperson about this.  And then I brought in the juror who made a comment during deliberations that raised the concern of the other jurors.  And I determined that it was a clear miscommunication.  It had to do with a statement that Mr. Kierzkowski made, Agent Kierzkowski made about someone who was dead.  And it was a miscommunication clearly between the two parties to the discussion.

I determined that it had no impact on the deliberations, and it had nothing to do with prior knowledge obtained during the course of the case.  And so for all of those reasons, I sent the jury back to continue their deliberations.  All right.  Any questions or concerns?

MR. BEHE:      No, Your Honor.  Thank you.

. . .

MR. ENGLE:      I guess one question I would ask, Your Honor, is, was the voir dire of the jurors on the record?

THE COURT:      It was not.

MR. ENGLE:      It was not on the record, okay.  All right.  Thank you. We'll discuss it.

THE COURT:      All right.  Thank you very much.  We are adjourned.

(Doc. 1769, 5/18/23 Trial Tr. 2674:20-2675:20).

At 3:30 p.m., while the jury was still deliberating, I called counsel back to the courtroom for a follow-up conference.  Having had time to conduct additional legal research, I had become concerned about the extemporaneous decision to clarify the jury's note by discussing it with two jurors off the record and without conferring with counsel.  (See id. at 2675:23-2677:25).  I explained to counsel my conclusion,

after reviewing applicable case law, that it was error on my part to have attempted to unravel the note's general allegations by querying jurors during deliberations outside the presence of counsel.  (See id. at 2675:23-2677:14, 2680:10-25).  I also relayed my concerns with respect to curing the issue: while I could have brought the subject juror and jury foreperson to the courtroom for on-the-record *voir dire*, doing so nearly three hours after the issue had been raised and addressed would risk disrupting the jury's resumed deliberations.  (See id. at 2677:1-14; see also id. at 2678:1-14).  Counsel for both parties shared the court's concern with interrupting the jury's work, and the parties and court agreed to allow the jury to continue deliberating.  (See id. at 2679:14-20, 2681:20-25).  White's counsel did, however, preserve the issue for later review.  (See id. at 2685:3-10; see also id. at 2678:9-14, 2682:1-5).

The jury reached a verdict at 6:45 p.m.  The jury acquitted White on all robbery, firearm, and conspiracy counts (Counts One, Two, Three, Four, Five, Six, Seven, and Eleven), apparently rejecting the government's theory that White was involved with or had coordinated the murder for hire.  The jury found him guilty, however, on the three substantive murder-of-witness counts (Counts Eight, Nine, and Ten).  The jury selected aiding-and-abetting as the sole basis for liability on Count Eight; Counts Nine and Ten had gone to the jury on Pinkerton coconspirator liability alone.

White has now filed three post-trial motions pursuant to Federal Rules of Criminal Procedure 29 and 33.  The first two motions seek a new trial based on the court's error in handling the jury note and the sufficiency and weight of the

evidence, respectively.  The third raises a newly discovered <u>Brady</u> issue.  White also moves pursuant to Federal Rule of Evidence 606(b) and Local Rule of Court 83.4 for leave to interview jurors about potential extraneous information received during deliberations and the court's communications with certain jurors about that potential information.

## II.  <u>Legal Standards</u>

### A.   **Rule 29 Motion for Judgment of Acquittal**

On motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the court must decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial.  <u>See</u> <u>United States v. Caraballo-Rodriguez</u>, 726 F.3d 418, 431 (3d Cir. 2013) (*en banc*) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)); <u>see also</u> <u>United States v. Freeman</u>, 763 F.3d 322, 343 (3d Cir. 2014).  The court must view the evidence in the light most favorable to the prosecution and must deny the motion "if there is substantial evidence . . . to uphold the jury's decision."  <u>See</u> <u>Caraballo-Rodriguez</u>, 726 F.3d at 430 (quoting <u>United States v. Gambone</u>, 314 F.3d 163, 170 (3d Cir. 2003)).  Under this highly deferential standard of review, it is not the court's task to "act as a thirteenth juror," weigh credibility, assign weight to evidence, or "substitut[e] [its] judgment for that of the jury."  <u>See</u> <u>id.</u> at 430-31 (citations omitted).  A court may only overturn a conviction for insufficient evidence "where the prosecution's failure is clear," <u>see</u> <u>United States v. Leon</u>, 739 F.2d 885, 890-91 (3d Cir. 1984) (quoting <u>Burks v. United States</u>, 437 U.S. 1, 17 (1978)), or where the verdict is "so insupportable as to fall below the

threshold of bare rationality," see Caraballo-Rodriguez, 726 F.3d at 431 (quoting

Coleman v. Johnson, 566 U.S. 650, 656 (2012) (*per curiam*)).

### B.    Rule 33 Motion for New Trial

Under Federal Rule of Criminal Procedure 33, "the court may vacate any

judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM.

P. 33(a).  Granting or denying a motion for a new trial "lies within the discretion of

the district court."  See United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006)

(citing United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000)).  A court evaluating a

Rule 33 motion does not view the evidence in a light favorable to the government

but instead must "exercise[] its own judgment in assessing the Government's case."

United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (citations omitted).  Rule

33 motions are disfavored and should be "granted sparingly and only in exceptional

cases."  United States v. Silveus, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting Gov't of

V.I. v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)).  Exceptional cases include those in

which trial errors "so infected the jury's deliberations that they had a substantial

influence on the outcome of the trial."  United States v. Thornton, 1 F.3d 149, 156

(3d Cir. 1993) (quoting United States v. Hill, 976 F.2d 132, 145 (3d Cir. 1992)).

### III.   **Discussion**[2]

White contends the court's multiple, *ex parte*, off-the-record

communications with two jurors in response to a jury note violated a trio of rights

---

[2] The court's error in addressing the jury note requires a new trial; thus, we will deny as moot White's separate motions for new trial or judgment of acquittal and for leave to conduct post-trial juror interviews.

grounded in the United States Constitution and the Federal Rules of Criminal Procedure. Specifically, White invokes his right under the Sixth Amendment to have counsel present at all critical stages of trial; his right under the Fifth and Sixth Amendments, as embodied in Federal Rule of Criminal Procedure 43, to be present personally at all critical stages of trial; and his right under the Sixth Amendment to an impartial jury. (<u>See</u> Doc. 1781 at 7-10). The government rejoins first that White has waived any challenge to the court's conduct and second that any error was harmless. (<u>See</u> Doc. 1817 at 8-22).

### A.    Waiver

The government contends White waived any right to challenge the court's *ex parte* interactions with jurors by declining the court's *post hoc* offer to question the jurors involved in those interactions on the record. (<u>See</u> Doc. 1817 at 8-11). The parties initially dispute whether what happened here amounts to "forfeiture" or to "waiver," if either. (<u>Compare id.</u>, <u>with</u> Doc. 1825 at 3 & n.1). Although courts and litigants often conflate the terms, they "are not synonymous." <u>See</u> <u>United States v. Dowdell</u>, 70 F.4th 134, 140 (3d Cir. 2023) (quoting <u>Hamer v. Neighborhood Hous. Servs. of Chi.</u>, 583 U.S. 17, 20 n.1 (2017)). Waiver is the "intentional relinquishment or abandonment of a known right," while forfeiture is the "failure to make the timely assertion of a right"; the latter can (and often does) happen inadvertently. <u>See</u> <u>id.</u> (first quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938); then quoting <u>United States v. Olano</u>, 507 U.S. 725, 733 (1993)).

The distinction in some cases has "great significance," in that waived arguments generally are not reviewable, whereas courts "may 'resurrect' forfeited

arguments" in certain circumstances.  See id. (first quoting Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 146 (3d Cir. 2007); then quoting Wood v. Milyard, 566 U.S. 463, 471 & n.5 (2012)).  But it is one without a difference in this case, because it is perfectly clear White neither waived nor forfeited the juror-communications issue.  As an initial matter, White's counsel were unaware of the court's *ex parte* communications with the jurors (and thus any need to object to their exclusion from those communications) until the court alerted counsel to its actions after the fact.  White could not have waived or forfeited his or his counsel's right to be present during interactions he did not know about.  Nor did he waive or forfeit any objection to those interactions during the first conference with the court—counsel's first opportunity to address the issue after becoming aware of it—during which White's counsel indicated they would "discuss" the matter, in effect putting the issue on hold.  (See 5/18/23 Trial Tr. 2675:14-18).

The government argues White's "waiver" occurred during a second conference with the court, when White declined the option to potentially cure the error by bringing the jurors individually into the courtroom for more questioning. (See Doc. 1817 at 10-11).  We convened for the second conference approximately 90 minutes after the first.  White's counsel reported that, just before the second conference, they had been preparing to make a motion reasserting the rights of White and his counsel to be present for any future communications with the jury. (See 5/18/23 Trial Tr. 2679:23-2680:8).  The defense never filed that motion, not because counsel failed to pursue or to preserve the issue, but because I called a

conference *sua sponte* and conceded my error both in responding to the jury's note without conferring with counsel and in failing to put the interaction on the record.

I put three options to defense counsel during the second conference: I could (1) attempt to recreate the conversations with the jurors from memory for purposes of creating a record; (2) bring the foreperson and subject juror to the courtroom for on-the-record questioning; or (3) "do nothing," which would allow the jury to keep deliberating and White to "preserve as an appellate matter" whether I had erred in handling the juror note. (See id. at 2678:1-16). Everyone—the court, White's counsel, and counsel for the government—was reluctant to disrupt the jury's work, nearly three hours after deliberations had resumed, by returning the foreperson and subject juror to the courtroom for questioning. (See id. at 2677:10-14, 2679:15-20, 2681:20-2682:10). We thus proceeded under the third option; I provided some additional detail about my conversations with the jurors, and the jury continued deliberating uninterrupted. (See id. at 2682:11-2684:6). It is clear from the record that all involved, including counsel for the government, understood proceeding in this way would not inhibit White's ability to revisit the issue post-trial. (See id. at 2678:9-14 (court noting to "do nothing and allow the jury to continue deliberations" would allow White to "preserve as an appellate matter" the juror-communication error); id. at 2682:1-5 (government counsel representing "[i]f there is a verdict, and it is against the Defendant, then there would be a reason to create a record and maybe something to do at that point with speaking to any of the jurors to see if any of that conduct affected their deliberations")).

14

White's counsel neither intentionally abandoned White's right to challenge the court's *ex parte* jury communications nor inadvertently failed to raise the issue. Counsel expressed their concerns with the court's conduct at the first opportunity after being apprised of the particulars of the communications. But by that point, the options available to White were quite limited: either bring the jurors back into the courtroom for questioning, interrupting and possibly agitating the jury nearly three hours into resumed deliberations, or let things play out and preserve the issue for later review in the event of a conviction.[3] Counsel elected the latter option, based on the court's—and the government's—express representations that the issue could be revisited if necessary after trial. We reject the government's waiver argument as baseless.

### B.    *Ex Parte* Communications

It was error for the court to communicate *ex parte* and off the record with jurors about any aspect of the trial, even to shed light on the jury's note. I stated as much on the record at trial. (See 5/18/23 Trial Tr. 2675:23-2677:14, 2680:10-25). That error at minimum denied White his right to be present at every critical stage of his trial, in violation of the Fifth and Sixth Amendments to the United States Constitution and Federal Rule of Criminal Procedure 43(a). See United States

---

[3] For this reason, White's circumstances are materially distinguishable from those in authorities invoked by the government, where courts found trial issues to have been waived when counsel "consciously refrain[ed] from objecting as a tactical matter" as part of an affirmative trial strategy. (See Doc. 1817 at 10-11 (collecting cases)); cf., e.g., United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (challenge to admission of "macabre details" of gang brutality under Federal Rule of Evidence 403 waived when defendant "welcomed" that evidence at trial as part of overall strategy to distance himself from gang).

v. Toliver, 330 F.3d 607, 611 (3d Cir. 2003); see also Illinois v. Allen, 397 U.S. 337, 338 (1970) (Sixth Amendment); United States v. Bertoli, 40 F.3d 1384, 1397 (3d Cir. 1994) (Fifth Amendment); FED. R. CRIM. P. 43(a). The Supreme Court of the United States has been unequivocal regarding this right: "Cases interpreting [Rule 43(a)] make it clear, if our decisions prior to the promulgation of the Rule left any doubt, that [a] jury's message should . . . [be] answered in open court and that [defense] counsel should . . . [be] given an opportunity to be heard before the trial judge respond[s]." Rogers v. United States, 422 U.S. 35, 39 (1975) (citations omitted). As we explain *infra*, our error arguably also denied White his constitutional right to counsel, though we acknowledge that to be a closer call. See United States v. Cronic, 466 U.S. 648, 659 (1984). I thus reaffirm my finding at trial that I erred in responding to the jury note.[4]

The only question that remains is how to characterize that error. White insists the error is structural and necessarily requires a new trial. (See Doc. 1781 at 11-18). If we characterize the error as violating White's Sixth Amendment right to

---

[4] The government relies on United States v. Scarfo, 41 F.4th 136 (3d Cir. 2022), for its initial contention that the court's interaction with the jury "was not error" at all. (See Doc. 1817 at 11-15). That reliance is misplaced. The Scarfo court did not conclude, as the government suggests, that the trial judge's delayed disclosure of an *ex parte*, off-the-record juror communication was not error; rather, the court assumed error *arguendo* and resolved the appeal on harmlessness. See Scarfo, 41 F.4th at 204. Nor do we read Scarfo's focus on timing—rather than on the fact or content of the *ex parte* communications—as implying the trial judge's interactions with the jury were not problematic in and of themselves. (Cf. Doc. 1817 at 17). The defendants complained only about the delay, not the interaction, see Scarfo, 41 F.4th at 204, so the propriety *vel non* of the initial interaction was not before the court. Scarfo of course is relevant to our analysis of the effect of our error, and it features in our analysis *infra*, but the decision does not answer whether an error occurred in the first instance.

counsel, he is correct, and the error requires automatic retrial.  See Cronic, 466 U.S. at 659 & n.25; Toliver, 330 F.3d at 613 (citing Cronic, 466 U.S. at 659; Roe v. Flores-Ortega, 528 U.S. 470, 483 (2000)).  White argues further that a new trial is required even if we view the issue as a violation of his personal right to be present or to an impartial jury, both of which are subject to a harmless-beyond-a-reasonable-doubt standard.  (See Doc. 1781 at 18-25); see also Toliver, 330 F.3d at 615 (right to be present); Remmer v. United States, 347 U.S. 227, 229 (1954) (right to impartial jury). The government rejoins that our error at most implicated White's personal right to be present and, in any event, was harmless.  (See Doc. 1817 at 17-22).

Our court of appeals confronted a similar question—whether harmless error analysis applied when a trial judge responded to a jury note without the defendant or defense counsel present—in United States v. Toliver, 330 F.3d 607 (3d Cir. 2003). The trial judge in Toliver received a note from the jury asking for transcripts of two witnesses' testimony to resolve a dispute regarding what the witnesses claimed the defendant had told them.  See Toliver, 330 F.3d at 609-10.  The judge sent excerpts from those transcripts to the jury room without consulting counsel.  See id.  During a subsequent conference addressing a second, substantive jury question, the judge told counsel about the first note and the court's response.  See id.  The jury returned a guilty verdict, and the defendant appealed, contending the trial judge had violated both his right to have counsel present and his personal right to be present at all critical trial stages in responding to the jury note *ex parte*.  See id. at 610.

On appeal, the parties agreed the trial judge had "compromised" the defendant's rights but disagreed as to the effect of that error.  See id.  The court of appeals rejected the defendant's efforts to frame the error as a deprivation of his right to counsel under Cronic.  See id. at 613-15.  The court began its analysis by acknowledging the cases cited by the defendant in which a trial judge's *ex parte* interactions with jurors were found to implicate the right to counsel and therefore Cronic's presumption of prejudice—*viz.*, Curtis v. Duval, 124 F.3d 1 (1st Cir. 1997), and French v. Jones, 282 F.3d 893 (6th Cir. 2002) ("French II"), vacated, 535 U.S. 1109 (2002).[5]  See Toliver, 330 F.3d at 613-14.  In both cases, trial judges provided supplemental instructions to juries without consulting, and in the absence of, the defendant and their counsel.  See Curtis, 124 F.3d at 4 (substantive instruction as to lesser-included offense); French II, 282 F.3d at 896-97 (nonstandard instruction on deadlock).  Both courts of appeals held that giving supplemental instructions is a critical stage of trial and the absence of defense counsel during that critical stage is a structural error.  See Curtis, 124 F.3d at 4-5 (citing Cronic, 466 U.S. at 659); French II, 282 F.3d at 899-901 (same).

The Third Circuit in Toliver distinguished the trial judges' actions in French and Curtis—which our court of appeals described as "affirmatively guid[ing] jurors as to how they should fulfill their decisionmaking function"—from the perfunctory

---

[5] The United States Supreme Court vacated the Sixth Circuit's decision in French II after the Third Circuit issued its decision in Toliver, remanding for further consideration in light of the Supreme Court's intervening decision in Bell v. Cone, 535 U.S. 685 (2002).  On remand, the Sixth Circuit reaffirmed its initial decision and determined Cone did not alter its analysis.  See French v. Jones, 332 F.3d 430, 438-39 (6th Cir. 2003) ("French III"), *cert. denied*, 540 U.S. 1018 (2003).

act of sending requested trial transcripts to the jury.  See Toliver, 330 F.3d at 614.

Instead, the court likened the circumstances before it to United States v. Widgery,

778 F.2d 325 (7th Cir. 1985).  In Widgery, the trial judge received two notes—one

reporting a juror was intoxicated and another asking what the jury should do in a

hypothetical deadlock—and addressed neither with counsel; in response to the first,

the judge tasked their bailiff to keep an eye on the accused juror, and in response

to the second, the judge had the bailiff tell the foreperson to "keep on trying."  See

Widgery, 778 F.2d at 327, 329.  The court of appeals framed the issue in terms of the

defendant's "right to see a note from the jurors and comment on the response," and

determined that right flows only from Rule 43, not the Constitution.  See id. at 329-

30.

The Widgery court, for its part, leaned heavily on the Supreme Court's

decision in Rushen v. Spain, 464 U.S. 114 (1983) (per curiam), in which the Court

explained that not every unrecorded ex parte communication between trial judge

and juror will require a new trial.  See Spain, 464 U.S. at 118-19.  The trial judge in

Spain spoke twice with a juror who had denied having personal experience with

violent crimes during voir dire but later recalled midtrial—when the murder of her

childhood friend came up as impeachment evidence for a government informant

witness—that she had in fact had such experience.  See id. at 115-16.  The judge

twice asked the juror whether her impartiality would be affected, and she twice

replied no; the judge told the juror not to be concerned and that the matter likely

would not come up again.  See id. at 116.  Defense counsel learned of the ex parte

communications for the first time after trial and, asserting a violation of the right to

be present, requested a new trial.  See id.  The trial judge held a hearing during which the juror testified her past experience had no impact on her ability to fairly judge the case.  See id.  The Supreme Court, on eventual habeas review, concluded the interactions between the judge and juror were harmless beyond a reasonable doubt, describing them as "innocuous" and emphasizing that they "did not discuss any fact in controversy or any law applicable to the case."  See id. at 120-21.

Against this jurisprudential backdrop, and underscoring the rarity of structural error, our court of appeals in Toliver framed the trial judge's error as a "failure to consult with defense counsel before responding to a jury note" subject to harmless-error analysis rather than a structural deprivation of the right to counsel at a critical stage.  See Toliver, 330 F.3d at 614-15.  The court acknowledged the case before it "point[s] to many of the perils that may result from judge-jury interaction in the absence of counsel," and observed, with respect to providing transcripts in particular, that the trial judge had employed none of the "safeguards" the court of appeals previously had found persuasive.  See Toliver, 330 F.3d at 616-17 (citing Bertoli, 40 F.3d at 1400-01).  The court concluded defense counsel should have been consulted regarding the jury's note and should have been present when the trial judge spoke with the jury, but because the court could "glean no particular prejudice" from the trial judge's conduct, it found the error to be harmless and affirmed.  See id. at 617.

Our court of appeals returned to the issue of ex parte judge-juror communications in United States v. Scarfo, 41 F.4th 136 (3d Cir. 2022).  The jury trial in Scarfo spanned 84 days over a six-month period.  See Scarfo, 41 F.4th at 164.

20

During closing arguments, a "distraught" juror expressed concern to the trial judge because she worried "her name [was] known," presumably to the defendants.  See id. at 199.  The judge alerted counsel to the interaction and sought their input; the judge also disclosed, for the first time, that the juror had voiced similar concerns "three or four weeks ago," but, at the time, the juror had been willing to see the case through to verdict.  See id.  The second *ex parte* conversation was transcribed; it is unclear whether the first was too.  See id. at 200.  All agreed the juror should be excused after the second conversation, and the trial judge discharged the juror, confirmed she had not expressed her concerns to other jurors, and replaced her with an alternate.  See id. at 199-200.  On appeal, the defendants argued the trial judge's conduct denied them their right to be present under the Fifth and Sixth Amendments and Rule 43(a).

The court of appeals observed that while it previously had "stress[ed] the advisability of having counsel present for all interactions between the court and jurors," see id. at 203 (alteration in original) (quoting United States v. Savage, 970 F.3d 217, 242 (3d Cir. 2020)), there is "no constitutional right to be present at *every* interaction between a judge and a juror," see id. (emphasis added) (quoting United States v. Gagnon, 470 U.S. 522, 526 (1985) (*per curiam*)).  Some level of *ex parte* interaction between judge and jury is unavoidable, especially in a lengthy trial, given the "day-to-day realities of courtroom life."  See id. at 203-04 (quoting Spain, 464 U.S. at 118-19).  The court nonetheless reiterated that its "preference" is for such interactions to be transcribed, see id. at 204 (quoting Savage, 970 F.3d at 242), and that the "better course" is for the court to consult with counsel after receiving

any juror communication "to give them a chance to participate in the decision-making on how to proceed," see id. (citing Toliver, 330 F.3d at 616).  The court then assumed *arguendo* that the trial judge's delay in disclosing the juror contact to counsel was error, before concluding that error was harmless given the juror's confirmation to the trial judge that she had not shared her safety concerns with other jurors.  See id.  The court did not address the question of structural versus potentially harmless error, presumably because counsel framed the issue as a denial of the personal right to be present rather than a denial of the right to counsel.  Cf. id. at 203.

The error *sub judice* differs both in kind and in degree from the trial judges' errors in Toliver and Scarfo.  Upon receiving the note raising a potential issue of juror misconduct, I initially intended to gather only enough information from the jurors involved to facilitate a meaningful discussion with counsel about how to proceed.  But those conversations evolved too quickly; it became apparent almost immediately that there had been no juror misconduct, only a factual misunderstanding about the case agent's testimony, which I reflexively corrected for both jurors.  I then instructed the foreperson to welcome the subject juror back into the fold and continue their deliberations, before assembling counsel and White in the courtroom to explain what had transpired.

Had the interaction with the jurors ended with the court's satisfaction no misconduct had occurred, we might be inclined to agree with the government that the error does not implicate Cronic's presumption of prejudice.  Cf. Spain, 464 U.S.

22

at 118-19; Toliver, 330 F.3d at 614, 617.  What arguably implicates that presumption, however, were the court's additional acts of correcting the subject juror's mistaken recollection of the evidence and giving supplemental instructions to the foreperson about how to proceed with deliberations having put the misunderstanding behind them.  See Curtis, 124 F.3d at 4-5; French II, 282 F.3d at 899-901; see also Hudson v. Jones, 351 F.3d 212, 217-18 (6th Cir. 2003) (differentiating between "new-versus-repeated" instructions for determining whether supplemental instruction is *per se* prejudicial under Cronic).  These interactions cannot be described as "incidental," cf. French III, 332 F.3d at 438, "innocuous," or unrelated to "any fact in controversy," cf. Spain, 464 U.S. at 121.  To the contrary, the court's actions "affirmatively guide[d the] jurors as to how they should fulfill their decisionmaking function," see Toliver, 330 F.3d at 614, and interfered with their independent recollections and consideration of the evidence, functions which are the exclusive province of the jury, see, e.g., Ewing's Lessee v. Burnet, 36 U.S. (11 Pet.) 41, 50-51 (1837).  For all of these reasons, we believe our *ex parte* interactions with the jurors implicate Cronic's presumption of prejudice.

Even if our error was not *per se* prejudicial, we certainly cannot say it was harmless.[6]  For errors implicating constitutional rights, the government must prove

---

[6] The government points out that, during the second conference, I observed "I *think* the result is harmless error."  (See 5/18/23 Trial Tr. 2684:23-24 (emphasis added); see also Doc. 1817 at 8).  That passing and equivocal observation, offered before the court had a meaningful opportunity to reflect on the error and to consider its impact, is hardly the final word on the matter.

harmlessness "beyond a reasonable doubt." <u>See</u> <u>Toliver</u>, 330 F.3d at 612 (quoting

<u>Chapman v. California</u>, 386 U.S. 18, 24 (1967)).  In other words, "there must be

'no reasonable possibility' of prejudice" for a constitutional error to be deemed

harmless.  <u>See</u> <u>id.</u> at 613 (quoting <u>United States v. Faulks</u>, 201 F.3d 208 (3d Cir.

2000)).  Harmlessness case law since <u>Toliver</u> generally falls into two camps: our

court of appeals has found juror-contact error to be harmless when a trial judge

responds to jury requests to review evidence without consulting counsel, <u>see, e.g.</u>,

<u>United States v. Holmes</u>, 339 F. App'x 151, 151-53 (3d Cir. 2009) (nonprecedential)

(denying new trial when trial judge provided admitted photograph and firearm to

jury without consulting counsel but declined request for affidavit ruled

inadmissible), but has found a new trial to be warranted when the judge's

communications crossed a line into supplemental, substantive instructions, <u>see, e.g.</u>,

<u>United States v. Woodson</u>, 508 F. App'x 189, 191 (3d Cir. 2013) (nonprecedential)

(affirming grant of new trial when trial judge responded to substantive inquiry

about jury charge without conferring with counsel).  When it is at least "possible"

the interaction "could have, in some manner, affected the jury's decision-making," a

new trial is appropriate.  <u>See</u> <u>id.</u>

    This case was hotly contested and exceptionally well tried from start to

finish.  White countered inculpatory evidence introduced by the prosecution, and

both sides offered impassioned closing arguments.  Courtroom tensions flowing

inexorably from the nature of evidence offered in this triple homicide trial were

palpable throughout the proceeding.  As the court observed to counsel during the

second conference on the jury note, it became very clear during the court's brief interactions with two jurors that these tensions had spilled over into, and were running high in, the jury room.  (See 5/18/23 Trial Tr. 2683:5-9, 2683:21-2684:4). Those circumstances alone would support a finding that the court's interactions with jurors, no matter how well-intended, "could have, in some manner, affected the jury's decisionmaking."  See Woodson, 508 F. App'x at 191.  Beyond that, however, the verdict the jury returned later that night is both internally inconsistent and difficult to reconcile with the evidence, the substantive instructions, and the government's theory of the case.  By all accounts, the jury appears to have returned a quintessential compromise verdict.  It is thus impossible to say—and certainly not beyond a reasonable doubt—whether the court's interactions with the jury influenced their verdict.  At minimum, there is at least "some" possibility the interaction affected the jury's decisionmaking.  See id.  For

all of these reasons, we conclude that the interest of justice requires a new trial.[7]

See FED. R. CRIM. P. 33(a).

---

[7] Because we will grant White's motion for a new trial and we find an evidentiary hearing to be unnecessary, we will deny as moot White's request that we reassign this case to another judicial officer for purposes of taking testimony regarding the juror-communication issue. (See Doc. 1781 at 25-27). We will also deny White's additional request that any evidentiary hearing "include the Court's off-the-record investigation of Mr. White's original recusal motion." (See id. at 27). White moved to disqualify the undersigned in January of this year based upon an alleged violation of Federal Rule of Criminal Procedure 11(c)(1). (See Doc. 1574). We denied that motion in a 22-page memorandum opinion issued on March 8, 2023. (See Doc. 1600). White now seeks to revisit that issue by tacking it onto his request for a hearing on his Rule 33 motion—he does not actually style his request as one for reconsideration, but that is, in effect, what he seeks. White specifically takes issue with the court relying on its own recollection (that is, the collective recollection of the undersigned, my career law clerk, and the assigned probation officer) regarding in-chambers events underlying White's earlier motion. (See Doc. 1781 at 27). The request for a hearing regarding the Rule 11(c)(1) issue will be denied; counsel have failed to establish—or to even assert—a valid basis for reconsideration of that order. See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (citation omitted) (party seeking reconsideration must show "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [decided] the [underlying motion]; or (3) the need to correct a clear error of law or to prevent manifest injustice"); see also United States v. Dupree, 617 F.3d 724, 732 (3d Cir. 2010) (applying reconsideration standard from Max's Seafood in criminal case).

In light of these requests, one additional matter bears observation. The court has endeavored to turn square corners with counsel for both parties at all times and in each of our countless rulings in this longstanding matter. The court acknowledges that its ex parte query of two jurors requires a retrial, which will consume additional resources for everyone involved. We also recognize that defense counsel have a duty to advocate zealously on behalf of their client; we appreciate and have timely fielded White's counsel's best efforts in furtherance of this duty. That said, the insinuation that our "unusual" error was methodical or the result of anything other than an inadvertent lapse during a fast-paced and complex jury trial, (see Doc. 1781 at 27), strains the outer boundary of proper advocacy and is not well taken.

IV.   **Conclusion**

I reaffirm my initial assessment at trial: I erred when communicating with two jurors in the absence of counsel.  I will grant White's motion for a new trial based upon this error.  I will deny his motion for a new trial and for judgment of acquittal based on the sufficiency and the weight of the evidence, as well as his motion for leave to conduct post-trial interviews with jurors, as moot.  White's Brady motion will be denied as moot and explicitly without prejudice, and I will task the parties to meet and confer to resolve all outstanding disclosure issues prior to retrial in this case.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:        September 14, 2023